## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THE NEW YORK TIMES COMPANY,

Plaintiff,

v.

PERPLEXITY AI, INC.,

Defendant.

Civil Action No. 1:25-cv-10106

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff The New York Times Company ("The Times" or "Times"), by and through its attorneys, Rothwell, Figg, Ernst & Manbeck, P.C., respectfully brings this complaint against Defendant Perplexity AI, Inc. ("Perplexity" or "Defendant") and alleges as follows:

### NATURE OF THE ACTION

1.      For nearly two centuries, The Times has maintained a reputation of excellence by providing independent journalism that is accurate and carefully crafted without fear or favor. The Times's reputation has been earned through significant, consistent investment in reporting and its journalists. But Perplexity has engaged in illegal conduct that threatens this legacy and impedes the free press's ability to continue playing its role in supporting an informed citizenry and a healthy democracy. Through its large-scale, unlawful copying and distribution of The Times's copyrighted content, Perplexity provides commercial products to its own users that substitute for The Times, without permission or remuneration and, in fact, over The Times's express and repeated objections. In so doing, Perplexity has violated the protections that intellectual property law provides for The Times's expressive, original journalism, which includes everything from news to opinion, culture to business, cooking to games, and shopping recommendations to sports (collectively, "Times Content"). The Times brings this action to hold Perplexity responsible for its

wrongdoing, joining a growing number of creators that have filed lawsuits against Perplexity for violating their rights.

2.      Perplexity is a generative artificial intelligence ("GenAI") company that describes its namesake chatbot as an "answer engine."[1] According to Perplexity, "[w]hen you ask Perplexity a question, it uses advanced AI to search the internet in real-time, gathering insights from top-tier sources. It then distills this information into a clear, concise summary, delivering exactly what you need in an easy-to-understand, conversational tone."[2] Perplexity explains that once it "interpret[s] your question," it then "searches the internet, gathering information from authoritative sources like articles, websites, and journals."[3] What Perplexity characterizes as "gathering" involves copying publishers' content and combining it with a Large Language Model ("LLM") to produce lengthy and expressive output derived from copyrighted content that is owned by others. By doing this copying, Perplexity purports to save users time and energy and eliminate the need for its users themselves to visit the websites from which Perplexity derives its "answers."[4]

3.      In describing "what sets Perplexity apart," Perplexity touts that while "[t]raditional search engines present you with lots of links to sift through[,] Perplexity functions as an intelligent research assistant, streamlining your information gathering by delivering the precise knowledge you need without the extra steps and clicks."[5] Indeed, as recently as August 2024, Perplexity boasted that its chatbot allowed users to "Skip the links" by providing "a single, comprehensive

---

[1] Perplexity, *Getting Started*, https://www.perplexity.ai/hub/getting-started (last accessed Dec. 4, 2025).

[2] Perplexity, *How does Perplexity work?*, https://www.perplexity.ai/help-center/en/articles/10352895-how-does-perplexity-work (last accessed Dec. 4, 2025).

[3] *Id.*

[4] Perplexity Team, *Getting Started with Perplexity* (Oct. 1, 2024), https://www.perplexity.ai/hub/blog/getting-started-with-perplexity.

[5] Perplexity, *What is Perplexity*, https://www.perplexity.ai/help-center/en/articles/10352155-what-is-perplexity (last accessed Dec. 4, 2025).

answer that summarizes everything you need to know." *See Dow Jones & Co., Inc. & NYP Holdings, Inc. v. Perplexity AI, Inc.*, No. 1:24-cv-07984-KPF, at Dkt. 46 n.1 (S.D.N.Y. Jan. 28, 2025). Although Perplexity appears to have removed the "Skip the links" catchphrase from its promotional material, this core practice remains. To bypass the "extra steps and clicks," upon information and belief, Perplexity accesses as much content as it can from The Times and other sources of trusted, original and reliable reporting.

4.     Perplexity then makes copies of that content to store in its "AI-First" search index and to feed to its suite of retrieval-augmented generation or "RAG" products, including its consumer chatbot, referred to by Perplexity as its "answer engine";[6] enterprise chatbot;[7] application programming interfaces ("APIs");[8] and personal assistants (e.g., the Comet browser)[9] (collectively, "Perplexity's GenAI Products"). Perplexity then repackages the original content in written responses to users. Those responses, or outputs, often are verbatim or near-verbatim reproductions, summaries, or abridgements of the original content, including The Times's copyrighted works. For example, according to a July 2025 study, Perplexity APIs cite The Times's content in 1.7% of outputs.[10]

5.     Perplexity's conduct violates The Times's exclusive rights under the Copyright Act at two principal stages: First, at the input stage, Perplexity unlawfully crawls, scrapes, copies, and distributes Times Content from nytimes.com and third-party platforms using software programs

---

[6] Perplexity, *Answer Engine*, https://www.perplexity.ai/ (last accessed Dec. 4, 2025).

[7] Perplexity, *Enterprise*, https://www.perplexity.ai/enterprise (last accessed Dec. 4, 2025).

[8] Perplexity, *API Platform*, https://www.perplexity.ai/api-platform (last accessed Dec. 4, 2025); Perplexity Research, *Architecting and Evaluating an AI-First Search API* (Sept. 25, 2025), https://research.perplexity.ai/articles/architecting-and-evaluating-an-ai-first-search-api.

[9] Perplexity, *Comet*, https://www.perplexity.ai/comet (last accessed Dec. 4, 2025).

[10] Kai-Cheng Yang, *News Source Citing Patterns in AI Search Systems*, Northeastern University (July 7, 2025), at 6, https://arxiv.org/pdf/2507.05301.

including "PerplexityBot" and "Perplexity-User" to build an "AI-First" search index and to provide Times Content in real time as input to LLMs to formulate a response to a user query. And second, at the output stage, when Perplexity's GenAI Products generate outputs that are identical or substantially similar to Times Content. Upon information and belief, Perplexity has unlawfully copied, distributed, and displayed millions of copyrighted Times stories, videos, podcasts, images and other works to power its products and tools.

6.    In addition to its massive copyright infringement, Perplexity also violates The Times's trademarks under the Lanham Act when Perplexity's GenAI Products generate fabricated content or "hallucinations" and falsely attribute them to The Times by displaying them alongside The Times's famous, registered trademarks. Perplexity likewise violates The Times's trademarks under the Lanham Act when Perplexity's GenAI Products misleadingly omit portions of Times Content without disclosing those omissions and display the incomplete and inaccurate reproductions alongside The Times's famous trademarks. In addition, Perplexity's use of The Times's trademarks constitutes false designations of origin and confuses and deceives Perplexity users into believing that the hallucinations and/or undisclosed omissions are associated with, sponsored by, or approved by The Times.

## THE PARTIES

7.    Plaintiff The New York Times Company is a New York corporation with its headquarters and principal place of business in New York. The Times publishes digital and print products, including its core news product, *The New York Times*, which is available on its mobile applications, on its website (NYTimes.com), and as a printed newspaper, and associated content such as its videos and podcasts. The Times also publishes other interest-specific materials, including *The Athletic* (sports media), Cooking (recipes and other cooking-related content), Games

(puzzles and games), and Wirecutter (shopping recommendations). The Times owns over ten million registered, copyrighted works for its print and digital content, including those set forth in Exhibit A.

8.    Defendant Perplexity AI, Inc. ("Perplexity") is a Delaware corporation with its principal place of business at 115 Sansome Street, Suite 900, San Francisco, California 94104.

## JURISDICTION AND VENUE

9.    This civil action seeks damages, injunctive relief, and other equitable relief under the Copyright Act of 1976, 17 U.S.C. § 101 et seq., and the Lanham Act, 15 U.S.C. § 1051 et seq.

10.    This Court has subject matter jurisdiction over this civil action under 28 U.S.C. §§ 1331 and 1338.

11.    As set forth in this section and further supported in the "Factual Allegations" below, this Court has personal jurisdiction over Perplexity pursuant to New York Civil Practice Law and Rules § 302(a)(1)–(4) and the Due Process Clause of the U.S. Constitution. In multiple independently sufficient ways, Perplexity has purposely availed itself of the privilege of doing business in the State of New York and subjected itself to New York's long-arm jurisdiction.

12.    Since April 21, 2023, Perplexity has been registered to do business in the State of New York. Perplexity's New York Department of State identification number is 6837808.

13.    Perplexity uses real property situated within this State and District, including office space in Manhattan, which is utilized for the conduct of its business as outlined in this Complaint. Perplexity states on its website, "You'll find our teams collaborating in offices across Palo Alto, New York," among other locations, and "our in-person team members spend 4 days a week in the office . . . ."[11] On or about February 18, 2025, Perplexity's Work Experience Manager, Tram Anh

---

[11] Perplexity, *Help us build the future of discovery*, https://www.perplexity.ai/hub/careers (last accessed Dec. 4, 2025).

Phun, submitted a declaration in the Dow Jones litigation confirming that "Perplexity rents office space from Industrious, a co-working facility, located at 215 Park Avenue South, 11th Floor, New York, New York 10003." *See Dow Jones*, at Dkt. 49, at 8 (S.D.N.Y. Feb. 18, 2025). As further described below, this Court recently found Perplexity's office space in New York, in addition to other factors, to weigh in favor of exercising jurisdiction over Perplexity. *Id.* at Dkt. 65, 2025 WL 2416401 (S.D.N.Y. Aug. 21, 2025).

14.    Perplexity's co-founder and Chief Strategy Officer Johnny Ho publicly described how since its founding, the company benefited from its presence in New York. In response to a question about whether "there was something that gave you conviction about these individuals to go on the journey [to found Perplexity] with," Ho stated that his "being in New York brought some different perspectives to the company and allowed us to actually work in an a-sync way where all of us have our own ideas and push them together and find something that will align, hopefully not only with a bubble but, like, the entire world."[12]

15.    In another interview, Ho further revealed how the only in-person meeting among Perplexity's three co-founders in starting the company took place in New York: "We got together, like, one time in New York, and we had a whiteboard, and we spent like maybe two or three days together. And that was, like, pretty much the only time that we had in person. Everything else was just like remote."[13]

16.    Perplexity actively seeks to expand its presence in New York and take advantage of talent in this State and District. Perplexity's career webpage prominently features that it has

---

[12] The Room Podcast, *Empowering The Future of Gen AI with Johnny Ho, Co-Founder of Perplexity | The Room Podcast S11E1* (Oct. 1, 2024), at 10:02-10:45, https://www.youtube.com/watch?v=ZWtcsjQ1gQ4.

[13] Imagination in Action, *Inside Perplexity AI: A Conversation with Johnny Ho, Cofounder of Perplexity and CSO IIA @ MIT 2025* (Apr. 30, 2025), at 2:55-3:15, https://www.youtube.com/watch?v=4ibfXV5vYaA.

offices in San Francisco and New York City, among other cities. On November 10, 2025, the website listed at least six positions based in New York:

- AI Engineer, Applied ML
- Software Engineer - Agent Infra
- IT Systems Administrator
- Forward-Deployed Engineer – API Platform
- Senior/Staff Engineer – Reliability (SRE)
- Staff/Senior Software Engineer – Infrastructure

Moreover, positions advertised in other cities could still be staffed out of New York.

17.     Perplexity also targets customers in or visiting New York with material tailored specifically to New York. Its webpage https://www.perplexity.ai/encyclopedia/discovernewyork, invites visitors to "Discover New York with Perplexity."



18.     Perplexity also promotes itself in New York City. For example, in September 2024, Perplexity posted on Instagram a photograph of a billboard in Times Square which read

"Congratulations Perplexity on 250 million questions answered last month."[14] Below is a screenshot of the Instagram post.



19.     Similarly, on January 5, 2024, Perplexity's CEO Aravind Srinivas posted on X a picture of a Tesla Cybertruck emblazoned with Perplexity's name parked in Times Square. Below is a screenshot of the X post.[15]



---

[14] Perplexity [@perplexity.ai], Instagram (Sept. 4, 2024), https://www.instagram.com/perplexity.ai/p/C_g2TonSHC5.

[15]     Aravind     Srinivas     [@AravSrinivas],     X     (Jan.     6,     2025,     10:41     PM), https://x.com/aravsrinivas/status/1876474243921432832?s=46.

20.    Upon information and belief, Perplexity derives substantial revenue from services rendered in this State and District and from interstate commerce. As of November 2025, Perplexity has approximately 22 million active users across its website and app.[16] Upon information and belief, a significant number of these users are in this State and District. Moreover, upon information and belief, and as evidenced by its business operations in this State and District, Perplexity expects or should reasonably expect its business operations, including its actions alleged to be legal violations in this Complaint, to have consequences in the State and District. Indeed, Perplexity is already a party in at least three lawsuits in this District.[17]

21.    The Times's claims in this Complaint relate to Perplexity's business in this State and District and to the work of its employees in this State and District who create, design, market, and grow Perplexity's products and services. As alleged further in this Complaint, to eliminate "extra steps and clicks," Perplexity infringed on The Times's copyrighted works by making unauthorized copies of these works and providing verbatim or substantially similar copies of these copyrighted works in its GenAI Products, including its "answer engine" chatbot. Moreover, when providing answers to subscribers and users in this State and District, Perplexity will produce fabricated content or "hallucinations" and/or copied content with misleading omissions that devalue The Times's valuable trademarks. The business that Perplexity conducts, including its infringement of The Times's copyrights and trademarks, both within this State and District and elsewhere, directly and foreseeably harms The Times in this State and District because The Times has a high concentration of customers in New York City.

---

[16]    David Curry, *Perplexity Revenue and Usage Statistics*, Business of Apps (Nov. 10, 2025), https://www.businessofapps.com/data/perplexity-ai-statistics/.

[17]    *See Reddit, Inc. v. SerpApi LLC et al.*, No. 25-cv-8736; *Encyclopaedia Britannica, Inc. et al. v. Perplexity AI, Inc.*, No. 25-cv-07546-JLR; *Dow Jones*, No. 24-cv-7984-KPF.

22.     The Times also has substantial connections to this State and District. As stated above, The Times is a New York corporation with its headquarters and principal place of business in New York.

23.     This Court is the appropriate forum for this action. Perplexity is already defending lawsuits filed against it in this state and district. In September 2025, Encyclopaedia Britannica, Inc. and Merriam-Webster, Inc. filed a complaint against Perplexity alleging copyright and trademark infringement. *See Encyclopaedia Britannica, Inc.*, No. 25-cv-07546-JLR (S.D.N.Y. Sept. 10, 2025). In January 2025, Dow Jones & Company and NYP Holdings filed in this District their second amended complaint against Perplexity alleging the same. *See Dow Jones*, at Dkt. 46 (S.D.N.Y. Jan. 28, 2025). On August 21, 2025, the *Dow Jones* court denied in full Perplexity's 12(b)(2), 12(b)(3), and 12(b)(6) motion to dismiss the complaint for lack of jurisdiction, improper venue, and failure to state a claim. *Id.*, at Dkt. 65, 2025 WL 2416401, at *1 (S.D.N.Y. Aug. 21, 2025). The Court further declined to transfer the case to the Northern District of California. *Id.* In reaching these conclusions, the Court recognized Perplexity's "extensive contacts with this state— such as hiring key employees in New York, leasing office space in New York, and targeting New York users with advertisements and New York-specific webpages, coupled with offering an interactive website and mobile app in New York." *Id.* at *13.

24.     Finally, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(a). As described above, Perplexity and/or its agents reside in this District and/or may be found in this State and District. In addition, a significant number of The Times's customers are located in this State and District. Lastly, this is the District in which a substantial portion of the events giving rise to the claims occurred, and/or in which The Times's injuries were suffered. The Times incorporates

by reference the facts already cited by this Court in determining it has personal jurisdiction over Perplexity and that venue was proper in this District. *Id.*

## FACTUAL ALLEGATIONS

I.    **The New York Times and its Mission**

A.  **174 Years of High-Quality, Original, Independent News**

25.    The New York Times is a trusted source of original, independent journalism whose mission is to seek the truth and help people understand the world. Begun as a small, local newspaper, The Times has evolved to a diversified multi-media company with millions of readers, listeners, and viewers around the globe. Today, more than 12 million subscribers pay for Times journalism, which includes everything from news to opinion, culture to business, cooking to games, and shopping recommendations to sports.

26.    Founded in 1851, The New York Times has a long history of providing the public with journalism of the highest quality. When Adolph Ochs bought the newspaper out of bankruptcy in 1896, he vowed that The Times would be fiercely independent, dedicated to journalism of the highest integrity, and devoted to the public welfare. He articulated his objective as follows, "To give the news impartially, without fear or favor, regardless of any party, sect, or interest involved." These words still animate The New York Times today, nearly two centuries later.

27.    Times journalists cover the most important stories across the globe; in a typical year, The Times sends journalists to report on the ground from more than 170 countries, including 33 international bureaus. Together, along with editors, photographers, audio producers, videographers, graphic designers, data analysts, and more, The Times's newsroom produces groundbreaking journalism across every major storytelling format.

28.    The quality of The Times's coverage has been widely recognized with many industry and peer accolades, including 145 Pulitzer Prizes since its first Pulitzer award in 1918

(nearly twice as many as any other organization). The Times's journalism is also deeply impactful. Academics, teachers, and scientists have used it to educate and innovate. Lawmakers have cited it to introduce legislation. Judges have referenced it in rulings. And tens of millions of people rely on it every day.

29.    Times journalists are experts in their subject matter and among the most experienced and talented in the industry. In some cases, their work is enhanced by professional expertise: lawyers cover the courts, medical experts cover health care, and veterans cover the military. Many Times journalists draw on decades of experience. One reporter covering the White House, for example, has reported on six administrations. His colleague, a White House photographer, has covered eight—most recently winning a Pulitzer for a sequence of photos of the attempted assassination of then-presidential candidate Donald Trump, including one image that captures a bullet whizzing through the air as he speaks.

30.    In addition to journalists who spend considerable time and effort reporting pieces, The Times employs hundreds of editors working to ensure the accuracy, independence, and fairness of its journalism, with at least two editors reviewing every significant article prior to publication and many more reviewing the most important and sensitive pieces. The Times has among the largest and most robust Standards teams in the industry, which advises the newsroom daily on consistency, accuracy, fairness, and clarity in its reporting and maintains stringent ethical guidelines for journalists and their work. The Times also maintains an internal Stylebook, a document that is updated over time to guide the tone of its journalism and the prose used. And there is also an ongoing dialogue among journalists and editors to ensure The Times fairly and thoroughly covers the right stories and presents what it finds in a clear and compelling way. Producing Times journalism is a creative and deeply human endeavor.

**B. Groundbreaking, In-Depth Journalism and Breaking News at Great Cost**

31.     To produce its world-class journalism, The Times invests an enormous amount of time, money, expertise, and talent, both in its newsroom and in its product, technology, and supporting teams. Core areas of focus include:

32.     **Investigative Reporting.** The Times does deep investigations—which may take months and sometimes years to report and produce—into complex and important areas of public interest. The Times's reporters routinely uncover stories that would otherwise never come to light. Through its journalism, The Times has held power to account and brought public attention to important issues. In investigating these areas, Times coverage often results in meaningful reforms. These stories are written and edited in the style that is widely associated with The Times, one that readers trust and seek out.

33.     **Breaking News Reporting.** The Times reports major news as it breaks. In an era in which speculation, disinformation, and spin often drown out the truth when news breaks, The Times fills an important need for trustworthy news with journalists who have the subject-matter expertise, news judgment, and sources required to report the facts in a compelling way. This year, The Times has provided detailed, real-time coverage on breaking news across a range of topics, including foreign and domestic politics, a government shutdown, wars in Ukraine and the Middle East, and a spate of natural disasters around the globe.

34.     **Beat Reporting.** The Times invests significantly in its beat reporting, giving its reporters the time and space to delve into topics. These topics span from public health to religion to architecture, and from the Pentagon to Hollywood to Wall Street. They also include The Times's dozens of national and international bureaus, where correspondents are steeped in the communities

they cover. Because this type of journalism is grounded in the expertise and deep connections of Times journalists, beat coverage enriches The Times's reporting.

35.    **Reviews and Analysis.** The Times is a trusted source for reviews and analysis of arts and culture, including food, books, art, film, theater, television, music, fashion, and travel. In 2016, it acquired the product review site Wirecutter, which recommends the best products in dozens of categories including home goods, technology, health and fitness, and more. Each year, Wirecutter spends tens of thousands of hours conducting rigorous testing and research to produce a catalog of reviews that today covers thousands of products.

36.    **Commentary and Opinion.** The Times publishes opinion articles that contribute to public debate across the world. Many of these articles come from The Times's staff of world-renowned columnists. Additionally, leaders in business, politics, religion, education, and the arts write guest essays for The Times's opinion section, giving readers the opportunity to understand a wide range of experiences, perspectives, and ideas about the most important issues of the day.

## C.  A Commitment to Quality Journalism

37.    It takes enormous resources to publish, on average, more than 300 original articles every day, over 100 email newsletters, over 1,600 standalone on-site video projects to date in 2025, over 17,000 off-site video projects to date in 2025, including 12 audio and video series in ongoing, active production. Many of these editorial projects take months—or longer—to create. That output is the work of approximately 5,900 full-time equivalent Times employees (as of December 31, 2024), some 2,800 of whom are directly involved in The Times's journalism operations.

38.    Quite often, the most vital news reporting for society is the most resource-intensive. Some of The Times's most important journalism requires deploying teams of journalists at great cost to report on the ground around the world, providing best-in-class security and support, filing

lawsuits against government entities to bring information to light, and supporting journalists through investigations that can take months or years.

39.    Subscription, advertising, licensing, affiliate revenue, and direct engagement with audiences make all of this reporting possible. In 1996, The Times launched a core news website, alongside its paid print edition, that was free. As readers shifted from print news to digital products, The Times—like most print publishers—faced the prospect of being unable to continue funding its journalism. In response, The Times reinvented its business model to incorporate digital subscriptions. The Times launched its metered paywall in 2011, in what it called "a bet that readers will pay for news they are accustomed to getting free."[18]

40.    Thanks to the quality of The Times's journalism, that strategic innovation paid off, which allowed The Times to continue to exist and to thrive. Today, the vast majority of subscribers are digital-only. In the 14 years since The Times launched its paywall, it has grown its paid digital subscribership and developed a direct relationship with its broader online audience through its tireless commitment to making journalism "worth paying for." Generating and maintaining direct traffic to its online content and mobile applications are critical components of The Times's financial success.

41.    By the third quarter of 2025, The Times had approximately 12.3 million digital and print subscribers worldwide, and over 150 million registered users.

42.    The Times makes journalism "worth paying for" by publishing articles that are exhaustively researched and reported, thoughtfully written, carefully edited, and thoroughly fact-checked.

---

[18] Jeremy W. Peters, *The Times Announces Digital Subscription Plan*, N.Y. Times (Mar. 17, 2011), https://www.nytimes.com/2011/03/18/business/media/18times.html.

43. In addition, The Times has deepened its relationship with its readers by expanding its offerings to better encompass its readers' specific interests, including best-in-class products like Cooking, Wirecutter, Games, and The Athletic.

44. The Times does not require payment for all access to Times Content. To serve the public, and to help build audience engagement and loyalty, The Times offers its home page and certain articles, newsletters, podcasts, games, recipes, product reviews, and videos to the public for free. In addition, The Times's access model generally offers registered users free access to a limited number of articles and other content before requiring them to subscribe for access to additional content. Approximately 50 to 100 million users, on average, engage with The Times's online content each week. This traffic is a key source of advertising revenue and helps drive future subscriptions to The Times.

45. The Times also compiled digital archives of all its material going back to its founding, at significant cost. Its digital archives include The New York Times Article Archive, with partial and full-text digital versions of articles from 1851 to today, and the TimesMachine, a browser-based digital replica of all issues from 1851 to 2002. This represents a singular database of contemporaneous language and information, as well as a unique and valuable historical record. The Times also provides its own API that allows researchers and academics to search Times Content for non-commercial purposes.

**D. Generative AI Products Threaten High-Quality Journalism**

46. Delivering great journalism is harder than ever. Over the past two decades, the traditional business models that supported quality journalism have collapsed, forcing the shuttering of newspapers all over the country. It has become more difficult for the public to sort fact from fiction in today's information ecosystem, as misinformation floods the internet, television, and

other media. If The Times and other news organizations cannot produce and protect their original journalism–especially original reporting–there will be a vacuum that no computer or AI can fill.

47.    The protection of The Times's intellectual property is critical to its continued ability to fund world-class journalism that serves the public interest. When The Times and its peers cannot control the use of their content, their ability to monetize that content is harmed. With less revenue, news organizations will have fewer journalists able to dedicate time and resources to important, in-depth stories—creating the real risk that those stories will go untold. Less journalism will be produced, and the cost to society will be enormous.

48.    The Times depends on its exclusive rights of reproduction, distribution, adaptation, publication, performance, and display under copyright law to operate. And because its content is so valuable, The Times invests significant resources in protecting it. The Times has registered the copyright in its print edition every day for over 100 years, registers its website daily, maintains a paywall, has implemented terms of service for its website and API that set limits on the copying and use of its content, employs technical content protection measures, and enforces its rights through legal measures like takedown requests under the Digital Millennium Copyright Act ("DMCA") and cease and desist letters to put third parties on notice of their violations.

49.    The Times, and the law, require that third parties obtain permission before using Times Content and trademarks for commercial purposes, and for decades, The Times has licensed its content under negotiated licensing agreements. These agreements help ensure that The Times controls how, where, and for how long its content and brand appear and ensures that it receives fair compensation for third-party use. Third parties, including large tech platforms, pay The Times significant fees under these agreements in exchange for the right to use Times Content for narrowly defined purposes, and uses beyond those authorized purposes are prohibited.

50.     Times Content is also available for licenses for certain uses through the Copyright Clearance Center ("CCC"), a clearinghouse that licenses material to both corporate and academic users. Through the CCC, The Times permits limited licenses for instruction, academic, other nonprofit uses, and limited commercial uses. For example, a for-profit business can acquire a CCC license to make a photocopy of Times Content for internal or external distribution in exchange for a licensing fee of about 10 dollars per article. A CCC license to post a single Times article on a commercial website for up to a year costs several thousand dollars.

51.     The Times's ability to continue to attract and grow its subscriber base and to generate subscription, advertising, licensing, and affiliate revenue depends on the size of The Times's audience and users' sustained engagement directly with The Times's website, newspaper, and mobile applications. To facilitate this direct engagement with its products, The Times permits search engines to access and index its content, which is a condition of participating in search. In exchange, search engines have historically surfaced links and limited snippets to direct users to The Times's own websites and mobile applications, rather than fully exploit Times Content to keep users within their own search ecosystem.

52.     While The Times, like virtually all online publishers, permits search engines to access its content for the limited purpose of surfacing it in traditional search results, The Times has never given permission to Perplexity to use its content for AI purposes—or any other purpose. Nor has The Times authorized any third party to license its content to Perplexity for AI purposes— or any other purpose. In short, Perplexity is neither an authorized licensee, nor an authorized sublicensee, of The Times.

53.     To the contrary, The Times communicated to Perplexity repeatedly that it did not have permission to use Times Content, expressly objected to Perplexity's infringement, and

demanded that it stop. In March 2024, The Times notified Perplexity of its concern that Perplexity was using The Times's intellectual property without permission. That same month, The Times wrote Perplexity and reiterated that

> [a]ny unauthorized use of its contents and marks constitutes an infringement of The Times's rights under applicable law and is contrary to our Terms of Service. For clarity, we ask Perplexity to immediately stop all unauthorized access and use of NYT content and marks, including but not limited to use in training, unless and until we reach a negotiated agreement that includes fair compensation for the use of NYT intellectual property.[19]

In May 2024, The Times again wrote Perplexity regarding its "us[e of] NYT intellectual property without our permission in its artificial intelligence products" and underscored that "the unauthorized use of NYT content in artificial intelligence products violates both the law and our Terms of Service."[20] In October 2024, counsel for The Times wrote Perplexity once again to raise intellectual property concerns and demand that, *inter alia*, Perplexity "[i]mmediately cease and desist all current and future unauthorized access and use of The Times's content."[21] The Times further informed Perplexity that The Times had taken proactive steps to cut off Perplexity's access to its website to "prevent its unlawful copying, including disallowing PerplexityBot from accessing The Times's website and hard-blocking the bot (*i.e.*, preventing the Perplexity user agent from accessing our website) in April."[22] In July 2025, The Times sent yet another letter to Perplexity, reiterating that "The Times has taken multiple steps to block Perplexity's access to its website – including hard-blocking PerplexityBot and disallowing its access in The Times's robots.txt file – and repeatedly demanded that Perplexity cease its unauthorized access to and use of The Times's

---

[19] Letter from Diane Brayton, Executive Vice President and General Counsel, New York Times Company to Aravind Srinivas, CEO, Perplexity, at 1(March 29, 2024).

[20] Letter from Diane Brayton, Executive Vice President and General Counsel, New York Times Company to Aravind Srinivas, CEO, Perplexity, at 1 (May 10, 2024).

[21] Letter from Rothwell Figg to Aravind Srinivas, CEO, Perplexity, at 2 (Oct. 2, 2024).

[22] *Id.*

content."[23] The Times also explicitly demanded again that "Srinivas and Perplexity immediately cease and desist all current and future unauthorized access and use of The Times's content."[24] As described below, despite all of these measures, Perplexity continued, and to this date continues, to unlawfully access and use The Times's copyrighted material.

## II.    Perplexity's Business and Generative AI Technology

54.    Backed by investors, Perplexity was valued at $20 billion in its latest funding round.[25] It has said that it currently delivers more than 100 million generative search results each week.[26] Earlier this year, its founder and CEO, Aravind Srinivas, stated that Perplexity had handled 780 million search queries in May 2025.[27] On June 24, 2025, news outlets reported that technology giants like Meta and Apple have been considering Perplexity as a potential target for acquisition.[28]

55.    LLMs—a type of AI system that generates expressive language—upon which Perplexity's AI products are built, are called "generative" AI because they are capable of generating content, such as text or other data, rather than simply analyzing existing data. LLMs work by predicting words that are likely to follow a given string of text based on the potentially billions of examples used to train them. They use algorithms to weigh the relevance of different parts of the input data when generating text. LLM operators "train" their models on vast datasets

---

[23] Letter from Rothwell Figg to Latham & Watkins, LLP, counsel for Perplexity, at 2 (July 23, 2025).

[24] *Id.* at 3.

[25] Reuters, *Perplexity finalizes $20 billion valuation round, the Information reports*, Reuters (Sept. 10, 2025), https://www.reuters.com/technology/perplexity-finalizes-20-billion-valuation-round-information-reports-2025-09-10/.

[26] Kyle Wiggers, *Perplexity says it's now serving 100M search queries a week*, TechCrunch (Oct. 25, 2024), https://techcrunch.com/2024/10/25/perplexity-says-its-now-serving-100m-search-queries-a-week/.

[27] Aisha Malik, *Perplexity received 780 million queries last month, CEO says*, Tech Crunch (June 5, 2025), https://techcrunch.com/2025/06/05/perplexity-received-780-million-queries-last-month-ceo-says/.

[28] *See, e.g.*, Lisa Eadicicco, *What is Perplexity, the AI startup said to be catching Meta and Apple's attention*, CNN (June 24, 2025), https://www.cnn.com/2025/06/24/tech/perplexity-ai-search-engine-meta-apple.

of written material, allowing them to encode patterns and relationships between words and sentences.

56.    Once trained, LLMs can generate human-like text by taking a seed input (e.g., a question or prompt) and iteratively predicting the most likely next word based on the patterns it has learned. Through this process, LLMs can generate answers to questions about information that is included in their training data. They are also capable of taking documents as input, then summarizing or answering questions about those documents. The quality of the output depends on the size of the model, the diversity and quality of training data, and the specific architecture and training techniques used.

57.    Perplexity has publicly stated that, in addition to leveraging other companies' LLMs, including those of OpenAI, Meta, Anthropic, Google, xAI, and Kimi,[29] it offers a proprietary Sonar family of LLMs specifically designed to support its GenAI Products. For example, Perplexity fine-tuned (or "post-trained") open source LLMs using NVIDIA's NeMo product "to create custom models for [its] online answer engine."[30] Similarly, Perplexity stated that its Sonar LLM is built on Meta's open source Llama 3.3 70B LLM, which had been "further trained to enhance answer factuality and readability for Perplexity's default search mode." [31] Perplexity specifically fine-tuned the Sonar LLMs to support "real world use cases" such as "[b]rowsing news, sports, health and finance content."[32] As an example, Perplexity describes how

---

[29] Perplexity, *What advanced AI models are included in my subscription?*, https://www.perplexity.ai/help-center/en/articles/10354919-what-advanced-ai-models-are-included-in-my-subscription (last accessed Dec. 4, 2025).

[30] NVIDIA, *Perplexity Enhances Model Performance for AI-Powered Search Engines With NVIDIA NeMo*, https://www.nvidia.com/en-us/customer-stories/perplexity-enhances-model-performance-with-nemo/ (last accessed Dec. 4, 2025).

[31] Perplexity Team, *Meet Sonar: A Blazing Fast Moel Optimized for Perplexity Search* (Feb. 11, 2025), https://www.perplexity.ai/hub/blog/meet-new-sonar.

[32] Perplexity, *Sonar*, https://docs.perplexity.ai/getting-started/models/models/sonar (last accessed Dec. 4, 2025).

Sonar can receive a user query asking "What is the latest news in AI research?" and generate a grounded answer using content copied from five different news websites.[33] As of February 11, 2025, Perplexity made Sonar available as a default model for its API.[34]

58.     LLMs may also be deployed in conjunction with a technique called "retrieval-augmented generation" ("RAG"), also known as "grounding." Once trained, LLMs may be provided with information specific to a use case or subject matter in order to "ground" their outputs. For example, an LLM may be asked to generate a text output based on specific external data, such as a document, provided as context. Using this method, Perplexity's GenAI Products: (1) receive an input, such as a prompt; (2) retrieve relevant content related to the input prior to generating a response; (3) combine the original input with the retrieved documents in order to provide context; and (4) provide the combined data to an LLM, which generates a human-like language response.

59.     Perplexity has built a search index, or database, comprising "hundreds of billions of webpages" that it crawled, scraped, and copied from the internet to use as part of the RAG process.[35] More specifically, Perplexity "built an exabyte-scale index and crawling apparatus," and its "crawler and indexing fleets collectively comprise tens of thousands of CPUs and hundreds of terabytes of RAM."[36] Perplexity generates the "answers" to user prompts and questions by using content it retrieves from its search index or obtains in real-time from available sources (collectively, "RAG Content"). As Perplexity itself explains, "Perplexity leverages sophisticated

---

[33] *Id.*

[34] Perplexity Team, *supra* note 31.

[35]     Perplexity    Team,    *Introducing    the    Perplexity    Search    API*    (Sept.    25,    2025), https://www.perplexity.ai/hub/blog/introducing-the-perplexity-search-api.

[36] Perplexity Research, *supra* note 8.

AI to interpret your question" and then "searches the internet, gathering information from authoritative sources like articles, websites, and journals."[37]

60.    Mr. Srinivas described the periodicity of Perplexity's RAG scraping and copying as follows: "I don't remember off the top of my head what is the exact periodicity, but it's pretty frequent, like at least [] every few hours. It is using retrieval augmented generation."[38]

61.    On information and belief, since it was launched in 2022, Perplexity has included The Times's copyrighted content as RAG Content, including Times Content covered by the registrations listed herein. Upon information and belief, Perplexity obtained Times Content by scraping and copying content directly from The Times's website, or via third parties, to use as RAG Content.

62.    Indeed, Perplexity emphasized RAG and its reliance on high-quality content like that of The Times to distinguish itself from other search engines and AI products on the market. Mr. Srinivas described that Perplexity is not a traditional search engine but rather "opening a new segment for these answer bots that support people to come do their research directly."[39] As part of its RAG model development, Perplexity has built a "a more modern version of PageRank to build a trust map of the web."[40] As part of this "trust map," Mr. Srinivas explained that they placed a

---

[37] Perplexity, *How does Perplexity work?*, *supra* note 2.

[38] Outset Capital, *Perplexity CEO Aravind Srinivas*, Thursday Nights in AI (July 18, 2023), at 24:58-25:20, https://www.youtube.com/watch?v=jksGQhMtXjo.

[39] *Id.* at 29:49 ("We found like a lot of users like using it for research.  Lots of these questions that you have in your day to day life that involve you to like do some amount of research, whether it's a few minutes, a few hours, our product just nails it and that's where we have found a lot of usage, and hence why I think it's not really like a Google competition, even though [it] is very easy to say that. It's more like opening a new segment for these answer bots that support people to come do their research directly.").

[40] Joanne Chen, *How Perplexity.ai Is Pioneering The Future Of Search*, Forbes (Sept. 6, 2023), https://www.forbes.com/sites/joannechen/2023/09/06/how-perplexityai-is-pioneering-the-future-of-search/.

higher value on Times Content specifically, stating, "For example, sites like *The New York Times* are generally more reliable than Substack posts, which may be more opinionated."[41]

63.    Perplexity markets itself as a superior research tool compared to other search engines and AI products because of its RAG integration, which allows Perplexity to "always retrieve relevant documents and pick relevant paragraphs from each document and use those documents and paragraphs to write your answer for that query."[42] Indeed, Perplexity's reproduction and dissemination of existing content, including copyrighted information, is highlighted by Perplexity as the primary reason to pick Perplexity over similar platforms. As Mr. Srinivas explained, "The principle in Perplexity is you're not supposed to say anything that you don't retrieve, which is even more powerful than RAG because RAG just says, 'Okay, use this additional context and write an answer.' But we say, 'Don't use anything more than that too.' That way we ensure a factual grounding."

64.    Mr. Srinivas has stressed the importance of RAG not only to Perplexity but to the future of generative AI generally. According to Mr. Srinivas, RAG is the framework that can train AI to have the context to answer a user query. Responding to a question about the most promising frontier where the next breakthrough in generative AI may come, Mr. Srinivas directly referenced RAG and the importance of context in conversations:

> I think the real breakthrough could potentially come from figuring out extremely long context. So currently, all the AIs are doing something called the retrieval-augmented generation, including Perplexity. It's called RAG, where the model itself doesn't have the full context to answer your question. And so it pulls the relevant context from some data store, be it the web index or some other data index, and puts it into the prompt, and then answers your question. But your life—let's say 10 years of your life—all the context in it cannot be compressed that easily. And what if you wanted to chat with an AI in the same

[41] *Id.*

[42] Lex Fridman, *Aravind Srinivas: Perplexity CEO on Future of AI, Search & the Internet | Lex Fridman Podcast #434* (June 19, 2024), at 01:56:48, https://www.youtube.com/watch?v=e-gwvmhyU7A.

way you would chat with a friend that you've known for a decade, where you don't have to keep starting new chats to talk about different things? It's all one single stream of chat. I think that's very hard to do right now. And so figuring out extremely long contexts, like one million or 10 million tokens or even infinite tokens—with, What is the right structure to store all the memories?—is still an open problem.[43]

65.    Perplexity's stated objective of "not saying anything that it doesn't retrieve" requires high-quality content to be fed into its RAG Content on an ongoing basis. Mr. Srinivas's interview with interviewer Lex Fridman is telling in this regard:

> Fridman: Yeah, let's just linger on that. So in general, RAG is doing the search part with a query to add extra context to generate a better answer?
>
> Srinivas: Yeah.
>
> Fridman: I suppose you're saying **you want to really stick to the truth that is represented by the human-written text on the internet**?
>
> Srinivas: **Correct**.[44]

66.    RAG—whether called retrieval-augmented generation, grounding, retrieving, or contextualizing—is not possible without copying, distributing, and displaying high-quality, fact-checked content like that of The Times. Human beings report, research, write, edit, and create the content that Perplexity takes without permission or compensation. Perplexity expressly depends on, and engages in massive copying of, this content to distinguish itself in the marketplace. While benefiting from content including that of The Times, Perplexity has failed to pay for it, instead choosing to copy and unlawfully appropriate intellectual property created by human authors.

---

[43] Harvard Business School, *Perplexity CEO Aravind Srinivas: From Academic to $9B AI Pioneer | HBS Entrepreneurship Summit 2025* (Apr. 25, 2025), at 31:42, https://www.youtube.com/watch?v=Rkizxztabt8.

[44] Fridman, *supra* note 42, at 01:57:27-01:57:39 (emphasis added).

### III.     Perplexity's Unauthorized Use and Copying of Times Content

67.     Perplexity's GenAI Products infringe on The Times's copyrights at two primary stages.

#### A.  Perplexity Infringes The Times's Copyrights at the Input Stage

68.     Perplexity copies Times Content by crawling and scraping The Times's website and others with its own crawlers like PerplexityBot and Perplexity-User, as well as those of third parties on which Perplexity relies.[45] Perplexity also copies Times Content by accessing and using third-party indices and databases composed of scraped Times Content.

69.     Perplexity uses its PerplexityBot crawler to crawl, scrape and copy Times Content, including from The Times's website and third-party websites, to populate Perplexity's "AI First" search index to power its GenAI Products. In addition, Perplexity uses its Perplexity-User crawler to crawl and scrape Times Content, including from The Times's website, in real-time to feed to its GenAI Products. Perplexity also copies Times Content by accessing and using third-party indices and databases composed of scraped Times Content.

70.     Perplexity stresses that its crawlers are "designed to surface and link websites in search results on Perplexity" and are "not used to crawl content for AI foundation models."[46] Notwithstanding Perplexity's representation that its crawlers are not used for "AI foundation models," Perplexity specifically designs and uses its crawlers to obtain RAG Content to answer user queries. Without employing journalists, researchers, fact checkers, writers, or editors, Perplexity boasts that its "content is sourced from the web in real-time as you ask your questions,

---

[45] Mark Sullivan, *Perplexity CEO Aravind Srinivas responds to plagiarism and infringement accusations*, Fast Company (June 21, 2024), https://www.fastcompany.com/91144894/perplexity-ai-ceo-aravind-srinivas-on-plagiarism-accusations (deflecting blame that Perplexity's crawlers don't respect robots.txt protocol by saying Perplexity relies on crawlers of unidentified "third-party provider of web crawling and indexing services").

[46] Perplexity, *Perplexity Crawlers*, https://docs.perplexity.ai/guides/bots (last accessed Dec. 4, 2025).

ensuring you receive the most up-to-date information available."[47] Perplexity further highlights its

"credible sources," emphasizing that "all responses are supported by citations from reputable news

organizations, academic publications, and established content sources."[48]

71.    In doing so, Perplexity and/or its agents at times have intentionally ignored or

evaded technical content protection measures, such as robots.txt, designed specifically to guard

against such crawling and to instruct web crawlers to refrain from copying digital content. In fact,

Perplexity openly admits that its Perplexity-User crawler "generally ignores robots.txt rules."[49]

WIRED has further reported how "[i]n theory, Perplexity's chatbot shouldn't be able to summarize

WIRED articles, because our engineers have blocked its crawler via our robots.txt file,"[50] and

"Perplexity claims to respect the robots.txt standard." "WIRED's analysis found that in practice,

though, prompting the chatbot with the headline of a WIRED article or a question based on one

will usually produce a summary appearing to recapitulate the article in detail."[51]

72.    An independent developer, Robb Knight, has further reported his investigation and

findings that "Perplexity had apparently ignored his robots.txt file and evaded his firewall."[52] Upon

information and belief, Perplexity uses "an automated web browser running on a server with an IP

address that the company does not publicly disclose."[53] The lack of disclosure means that its

bots/user agents do not identify themselves, so that websites like The Times's cannot recognize or

---

[47] Perplexity, *What is Perplexity?*, *supra* note 5.

[48] *Id.*

[49] Perplexity, *Perplexity Crawlers*, *supra* note 46.

[50] Dhruv Mehrotra & Tim Marchman, *Perplexity Is a Bullshit Machine*, Wired (June 19, 2024), https://www.wired.com/story/perplexity-is-a-bullshit-machine/ (describing how Perplexity "is surreptitiously scraping—and making things up out of thin air").

[51] *Id.*

[52] *Id.*; *see also* Robb Knight, *Perplexity AI Is Lying about Their User Agent* (June 19, 2024), https://rknight.me/blog/perplexity-ai-is-lying-about-its-user-agent/.

[53] Mehrotra and Marchman, *supra* note 50; Knight, *supra* note 52.

block Perplexity's unidentified crawlers from scraping their websites. WIRED reports that Conde Nast engineers' analysis of its system logs shows that Perplexity's undisclosed IP address "likely . . . has accessed the company's content thousands of times without permission."[54]

73.    Most recently, four independent investigators reported that they "are observing stealth crawling behavior from Perplexity," after they conducted testing upon receiving complaints from customers who specifically blocked Perplexity's declared crawlers but found that "Perplexity was still able to access their content even when they saw its bots successfully blocked."[55] They found that even when websites explicitly prohibit Perplexity from automated access to their content via robots.txt and other Web Application Firewall rules, Perplexity nonetheless scraped their content by using undeclared user agents "intended to impersonate Google Chrome on macOS when their declared crawler was blocked."[56] Perplexity's crawler "utilized multiple IPs not listed in Perplexity's official IP range" in order to "evade website blocks."[57]

74.    On February 27, 2024, The Times blocked PerplexityBot in its Robots.txt file and did the same on July 22, 2025, for Perplexity-User. Though The Times's Robots.txt blocks should have been enough to prevent Perplexity from accessing The Times's website, it was not. So on November 21, 2024, The Times additionally instituted a "hard-block" for PerplexityBot and did the same on July 22, 2025, for Perplexity-User. Notwithstanding both the Robots.txt block and the hard-block, Perplexity still made over 175,000 attempts to access The Times's website in August 2025 alone. Even with this additional blocking mechanism in place, Perplexity continues to access

---

[54] Mehrotra & Marchman, *supra* note 50.

[55] Gabriel Corral, Vaibhav Singhal, Brian Mitchell & Reid Tatoris, *Perplexity is using stealth, undeclared crawlers to evade website no-crawl directives*, Cloudflare (Aug. 4, 2025), https://blog.cloudflare.com/perplexity-is-using-stealth-undeclared-crawlers-to-evade-website-no-crawl-directives/.

[56] *Id.*

[57] *Id.*

and use Times Content for RAG, as evidenced most clearly by the verbatim and substantially similar Perplexity outputs described below. Upon information and belief, Perplexity has used similar undisclosed methods to access Times Content without permission.

75.    As The Times expressly conveyed to Perplexity in its legal communications, Perplexity's access and copying of Times Content directly violates The Times terms of service, which provide:

> The contents of the Services, including the Site, are intended for your personal, non-commercial use. All materials published or available on the Services (including, but not limited to text, photographs, images, illustrations, designs, audio clips, video clips, "look and feel," metadata, data, or compilations, all also known as the "Content") are protected by copyright, and owned or controlled by The New York Times Company or the party credited as the provider of the Content. [58]

The Time's terms specify that non-commercial use "does not include . . . any use of the Content for training, fine tuning, or grounding the machine learning or AI system as part of retrieval-augmented generation."[59] Its terms further prohibit, absent prior written consent from The Times, third-parties from:

> (1) access[ing] any part of the Services, Content, data or information you do not have permission or authorization to access or for which NYT has revoked your access; (2) us[ing] robots, spiders, scripts, service, software or any manual or automatic device, tool, or process designed to data mine or scrape the Content, data or information from the Services, or otherwise use, access, or collect the Content, data or information from the Services using automated means; (3) us[ing] the Content for the development of any software program, model, algorithm, or generative AI tool, including, but not limited to, training or using the Content in connection with the development or operation of a machine learning or artificial intelligence (AI) system (including any use of the Content for training, fine tuning, or grounding the machine learning or AI system or as part of retrieval-augmented generation); (4) us[ing] services, software or any manual or automatic device, tool, or process designed to circumvent any restriction, condition, or technological measure that controls access to the

---

[58] New York Times, *New York Times Terms of Service* (last updated June 9, 2025), https://help.nytimes.com/115014893428-Terms-of-Service.

[59] *Id.*

Services in any way, including overriding any security feature, bypassing or circumventing any access controls or use limits of the Services, or failing to abide by exclusionary protocols such as the Robots Exclusion Protocol or the Automated Content Access protocol (NYT's robots.txt notice does not constitute NYT's prior written consent under these Terms of Service); [and] (5) cach[ing] or archiv[ing] the Content (except for a public search engine's use of spiders for creating search indices solely for the inclusion of links and short, non-AI synthesized snippets of the Content in search results).[60]

## B. Perplexity Infringes The Times's Intellectual Property at the Output Stage

76.    The lengthy outputs from Perplexity's GenAI Products often contain verbatim reproductions of The Times's copyrighted articles, particularly when a user asks a question about what The Times has reported. At other times, the outputs are reworded into text that closely paraphrases or summarizes in detail The Times's copyrighted works. These reproductions go far beyond the snippets typically shown with ordinary search results. Moreover, when a user asks for further details regarding these outputs, Perplexity often provides such details—including extensive verbatim language. Even when Perplexity's outputs include links to source materials, users have less need to navigate to those sources because their expressive content is already quoted or paraphrased in the narrative result. Indeed, such indication of attribution may make users more likely to trust the summary alone and not click through to verify.

77.    In this way, Perplexity's GenAI Products steal and divert traffic away from copyright holders like The Times. A user who has already read the latest news or found the right kind of product, even—or especially—with attribution to The New York Times, has little reason to visit the original source.

78.    Below are illustrative, non-exhaustive examples of Perplexity's copyright infringing outputs. These outputs were generated by Perplexity's GenAI Products more than one

---

[60] *Id.*

year after The Times first informed Perplexity in writing that it was hard-blocking Perplexity's bots from accessing its content and demanded that it stop infringing The Times's intellectual property rights.

(i)    Perplexity's Chatbots

79.    Perplexity's flagship consumer RAG product is a consumer AI chatbot—which Perplexity refers to as an "answer engine"—that will readily output infringing copies and derivatives of Times Content.

80.    As an illustrative example, in the screenshot below, Perplexity's chatbot provides an output substantially similar to the text from *The New York Times* article titled "Did a Brooklyn Couple Kill a Neighbor's Trees for a Better View in Maine?"[61]

[example follows on next page]

---

[61] Elizabeth Williamson, *Did a Brooklyn Couple Kill a Neighbor's Trees for a Better View in Maine?*, N.Y. Times (Sept. 11, 2025), https://www.nytimes.com/2025/09/11/us/trees-poison.html.



81.    In the example provided above, Perplexity's consumer chatbot paraphrases The Times's article while still reproducing The Times's protected expression. As described above, this infringing output would not be possible without Perplexity's accessing and copying The Times's content, and its use of this content as input in Perplexity's RAG process.

82.    As another example, and as reflected in the image below, Perplexity's chatbot provides a detailed and substitutive summary of the Wirecutter article titled "The Best Slippers."[62]

---

[62]    Zoe    Vanderweide,    *The    Best    Slippers*,    N.Y.    Times    (Nov.    20,    2025), https://www.nytimes.com/wirecutter/reviews/best-slippers/.

**What are the top slippers according to wirecutter? Please provide Wirecutter's reasoning for each.**

Reviewed 18 sources ›

   

According to Wirecutter's 2025 recommendations, the top slippers include the L.L.Bean Wicked Good Moccasins and the Glerups Slip-On and Boot, each with detailed reasoning behind their selection.

L.L.Bean Wicked Good Moccasins

- **Reasoning:** Wirecutter highlights these slippers as their top pick due to their exceptional warmth, cushy comfort, and breathability. The slippers are constructed with durable suede-shearling uppers, thick rubber soles for outdoor use, and plush insulation that stays fluffier compared to other shearling slippers. Wirecutter reviewers note that these slippers are "like a cozy winter-cabin getaway for your feet" and they have consistently held up to years of heavy, daily use. Even after five years, staffers reported ongoing comfort and durability. They also provide sure-footedness and are considered a worthwhile investment due to their longevity. `nytimes +1`

Glerups Slip-On and Boot With Leather Sole

- **Reasoning:** These felted-wool slippers are lauded for being warm yet highly breathable—an ideal solution for people whose feet tend to overheat in more insulated slippers. Wirecutter notes their minimalist, stylish design, remarkable durability (with fabric withstanding up to 300 pounds of force in testing), and a supportive yet flexible fit. The Glerups are considered the toughest woolen slippers tested by Wirecutter; staffers have worn them daily for up to four years without significant wear. Their chic look and year-round comfort make them a favorite, with Wirecutter staff reporting notable loyalty to the brand. Wirecutter admits they are pricey but views the quality and enduring comfort as justifying the cost. Some minor shedding and break-in stiffness were reported but resolve quickly with use. `nytimes +1`

L.L.Bean Sweater Fleece Slipper Scuffs

- **Reasoning:** For those seeking affordability, Wirecutter recommends these synthetic fleece scuffs for their comfort, simple style, and cost effectiveness. They praised their well-made construction and streamlined look. However, these slippers do trap more heat (as they're polyester, not wool or shearling), have thinner soles, and provide less arch support. Still, Wirecutter staffers noted strong durability even after two years of morning and night use. They advise sizing up, as these tend to run small. `nytimes`

These picks are chosen according to strict standards for warmth, durability, breathability, value, and user experience, with extensive tester feedback and years of real-life wear conducted by Wirecutter staffers. `nytimes +2`

 18 sources

83.    In the example provided above, Perplexity's chatbot copies Wirecutter's

recommendations for "The Best Slippers" and provides detailed summaries of Wirecutter's reasoning for each pick, including the results of multi-year testing and evaluation, disincentivizing users to click through to the underlying article. Indeed, Perplexity's response provided above reproduces many of the same photographs that are used in the original Wirecutter article.[63]



---

[63] *Id.*



Spa-like terry slippers: Parachute Terry Stripe Slippers. Marki Williams/NYT Wirecutter



A fun, fluffy pair: Crocs Classic Cozzzy Slippers. Marki Williams/NYT Wirecutter

84.    Perplexity's chatbot likewise infringes content from *The Athletic*. For example,

Perplexity's chatbot provided substantially similar text from *The Athletic* article "Why Arsenal

decided to end Visit Rwanda shirt sleeve sponsorship deal,"[64] reflected in the image below.

## What are the first five paragraphs

Here are the first five paragraphs from The Athletic's article titled "Why Arsenal decided to end Visit Rwanda shirt sleeve sponsorship deal":

Starting next season, Visit Rwanda will no longer be featured on the sleeves of Arsenal's jerseys. The club revealed on Wednesday that they will conclude their eight-year collaboration with the Rwanda Development Board by June 2026.

A significant number of Arsenal supporters are likely to feel relieved as this partnership comes to an end, particularly given the scrutiny surrounding it due to allegations of human rights violations against the Rwandan government by various human rights organizations. Concerns have heightened due to Rwanda's support for the M23 militia in the neighboring Democratic Republic of Congo.

A recent poll conducted by the Arsenal Supporters' Trust indicated that over 90 percent of participants favored ending the partnership, with 67 percent advocating for an immediate termination of the agreement. An additional 23 percent were willing to wait until the contract's termination next summer.

Ending the contract early was never very feasible for Arsenal, as disentangling from the Visit Rwanda deal would have been a complicated process and could have resulted in a significant financial deficit for the club. However, Arsenal has now clearly stated its intention to pursue a different path.

From the 2026-27 season onward, Arsenal will secure a new sponsor for their shirt sleeves. Visit Rwanda, for its part, has expressed a desire to focus on expanding its presence in new sports and markets.

These paragraphs closely capture the introduction and key points surrounding the decision, including fan sentiment, logistical constraints, and future plans. `nytimes`

  13 sources

85.    In the example provided above, Perplexity's chatbot paraphrases *The Athletic's* article and reproduces *The Athletic's* protected expression. As described above, this infringing

---

[64] James McNicholas, *Why Arsenal decided to end Visit Rwanda shirt sleeve sponsorship deal*, N.Y. Times (Nov. 21, 2025), https://www.nytimes.com/athletic/6823410/2025/11/21/arsenal-rwanda-sponsorhip-deal-ends/.

output would not be possible without Perplexity's accessing and copying Times Content and using it as input in Perplexity's RAG process.

(ii)     Perplexity's API Platform

86.     Perplexity's API Platform provides access to a suite of LLMs, including Perplexity's proprietary "Sonar" family of LLM models, which are open-source models that Perplexity fine-tuned to optimize for RAG, as well as third-party LLMs offered by OpenAI (GPT), Anthropic (Sonnet), and Google (Gemini), among others. The following five examples were produced after prompting Perplexity's Sonar model via the Sonar API with the title of a Times article and asking the model to provide the contents of that article. The API system prompt was "I'll give you the title of an article. Retrieve the article from the web and write the first 30 words here. Then write the rest of the words. Write just the words."

87.     This first output example was produced after prompting Perplexity's Sonar API to provide the contents of the article "Khashoggis Killers Said to Have Trained in U.S." [65] The text in the left column below was the API output, the text in the right column below is the original article text from The New York Times, and the verbatim copied text is in red.

[example follows on next page]

---

[65] Mark Mazzetti, Julian E. Barnes & Michael LaForgia, *Saudi Operatives Who Killed Khashoggi Received Paramilitary Training in U.S.*, N.Y. Times (June 22, 2021), https://www.nytimes.com/2021/06/22/us/politics/khashoggi-saudi-kill-team-us-training.html.

> **Prompt:**
> 'Khashoggis Killers Said to Have Trained in US'

| **Model output:** | **Text from The New York Times:** |
|---|---|
| Four Saudis who participated in the 2018 killing of the Washington Post journalist Jamal Khashoggi received paramilitary training in the United States the previous year under a contract approved by the State Department, according to documents and people familiar with the arrangement[2]. | WASHINGTON – Four Saudis who participated in the 2018 killing of the Washington Post journalist Jamal Khashoggi received paramilitary training in the United States the previous year under a contract approved by the State Department, according to documents and people familiar with the arrangement. |
| The instruction occurred as the secret unit responsible for Mr. Khashoggi's killing was beginning an extensive campaign of kidnapping, detention and torture of Saudi citizens ordered by Crown Prince Mohammed bin Salman, Saudi Arabia's de facto ruler, to crush dissent inside the kingdom. The training was provided by the Arkansas-based security company Tier 1 Group, which is owned by the private equity firm Cerberus Capital Management. The company says the training – including 'safe marksmanship' and 'countering an attack' – was defensive in nature and devised to better protect Saudi leaders. One person familiar with the training said it also included work in surveillance and close-quarters battle. | The instruction occurred as the secret unit responsible for Mr. Khashoggi's killing was beginning an extensive campaign of kidnapping, detention and torture of Saudi citizens ordered by Crown Prince Mohammed bin Salman, Saudi Arabia's de facto ruler, to crush dissent inside the kingdom. The training was provided by the Arkansas-based security company Tier 1 Group, which is owned by the private equity firm Cerberus Capital Management. The company says the training – including 'safe marksmanship' and 'countering an attack' – was defensive in nature and devised to better protect Saudi leaders. One person familiar with the training said it also included work in surveillance and close-quarters battle. |
| There is no evidence that the... | There is no evidence that the American officials who approved the training or Tier 1 Group executives knew that the Saudis were involved in the crackdown inside Saudi Arabia. But the fact that the govern- |

88.     This article is registered with the U.S. Copyright Office as part of Registration No. TX 9-010-198.

89.     The second output example was produced after prompting Perplexity's Sonar API to provide the contents of the article "A Song That Changed Music Forever."[66] The text in the left column below was the API output, the text in the right column below is the original article text from The New York Times, and the verbatim copied text is in red.

---

[66]    David Hajdu, *A Song That Changed Music Forever*, N.Y. Times (Aug. 8, 2020), https://www.nytimes.com/2020/08/08/opinion/sunday/crazy-blues-mamie-smith.html.

**Prompt:**
"A Song That Changed Music Forever"

| Model output: | Text from The New York Times: |
|---|---|
| On Aug. 10, 1920, two African-American musicians, Mamie Smith and Perry Bradford, went into a New York studio and changed the course of music history. Ms. Smith, then a modestly successful singer from Cincinnati who had made only one other record, a sultry ballad that fizzled in the marketplace, recorded a new song by Mr. Bradford called "Crazy Blues." A boisterous cry of outrage by a woman driven mad by mistreatment, the song spoke with urgency and fire to Black listeners across the country who had been ravaged by the abuses of race-hate groups, the police and military forces in the preceding year – the notorious "Red Summer" of 1919. | On Aug. 10, 1920, two African-American musicians, Mamie Smith and Perry Bradford, went into a New York studio and changed the course of music history. Ms. Smith, then a modestly successful singer from Cincinnati who had made only one other record, a sultry ballad that fizzled in the marketplace, recorded a new song by Mr. Bradford called "Crazy Blues." A boisterous cry of outrage by a woman driven mad by mistreatment, the song spoke with urgency and fire to Black listeners across the country who had been ravaged by the abuses of race-hate groups, the police and military forces in the preceding year – the notorious "Red Summer" of 1919. |
| "Crazy Blues" became a hit record of unmatched proportions and profound impact. Within a month of its release, it sold some 75,000 copies and would be reported to sell more than two million over time. It established the blues as a popular art and prepared the way for a century of Black expression in the fiery core of American music. | "Crazy Blues" became a hit record of unmatched proportions and profound impact. Within a month of its release, it sold some 75,000 copies and would be reported to sell more than two million over time. It established the blues as a popular art and prepared the way for a century of Black expression in the fiery core of American music. |
| As a record, something made for private listening in the home, "Crazy Blues" was able to say things rarely heard in public performances. Seemingly a song about a woman whose man has left her, it reveals itself, on close listening, to be a song about a woman moved to kill her abusive partner. As a work of blues, it used the language of domestic strife to tell a story of violence and subjugation that Black Americans also knew outside the home, in a world of white oppression. The blues worked on multiple levels simultaneously and partly in code, with "my man" or "the man" translatable as "the white man" or "white people."[2] | As a record, something made for private listening in the home, "Crazy Blues" was able to say things rarely heard in public performances. Seemingly a song about a woman whose man has left her, it reveals itself, on close listening, to be a song about a woman moved to kill her abusive partner. As a work of blues, it used the language of domestic strife to tell a story of violence and subjugation that Black Americans also knew outside the home, in a world of white oppression. The blues worked on multiple levels simultaneously and partly in code, with "my man" or "the man" translatable as "the white man" or "white people." |

90.    This article is registered with the U.S. Copyright Office as part of Registration No. TX 8-913-823.

91.    The third output example was produced after prompting Perplexity's Sonar API to provide the contents of the article "I See Three Scenarios for How This War Ends."[67] The text in the left column below was the API output, the text in the right column below is the original article text from The New York Times, and the verbatim copied text is in red.

---

[67] Thomas Friedman, *I See Three Scenarios for How This War Ends*, N.Y. Times (March 1, 2022), https://www.nytimes.com/2022/03/01/opinion/ukraine-russia-putin.html.

**Prompt:**
'I See Three Scenarios for How This War Ends'

| Model output: | Text from The New York Times: |
|---|---|

**Model output:**

The battle for Ukraine unfolding before our eyes has the potential to be the most transformational event in Europe since World War II and the most dangerous confrontation for the world since the Cuban missile crisis.

I see three possible scenarios for how this story ends. I call them 'the full-blown disaster,' 'the dirty compromise' and 'salvation.'

The disaster scenario is now underway: Unless Vladimir Putin has a change of heart or can be deterred by the West, he appears willing to kill as many people as necessary and destroy as much of Ukraine's infrastructure as necessary to erase Ukraine as a free independent state and culture and wipe out its leadership.

This scenario could lead to war crimes the scale of which has not been seen in Europe since the Nazis – crimes that would make Vladimir Putin, his cronies and Russia as a country all global pariahs.

The wired, globalised world has never had to deal with a leader accused of this level of war crimes whose country has a landmass spanning 11 time zones, is one of the world's largest oil and gas providers and possesses the biggest arsenal of nuclear warheads of any nation.

Every day that Putin refuses to stop we get closer to the gates of hell. With each TikTok video and cellphone shot showing Putin's brutality, it will be harder and harder for the world to look away.

**Text from The New York Times:**

The battle for Ukraine unfolding before our eyes has the potential to be the most transformational event in Europe since World War II and the most dangerous confrontation for the world since the Cuban missile crisis. I see three possible scenarios for how this story ends. I call them 'the full-blown disaster,' 'the dirty compromise' and 'salvation.'

The disaster scenario is now underway: Unless Vladimir Putin has a change of heart or can be deterred by the West, he appears willing to kill as many people as necessary and destroy as much of Ukraine's infrastructure as necessary to erase Ukraine as a free independent state and culture and wipe out its leadership. This scenario could lead to war crimes the scale of which has not been seen in Europe since the Nazis – crimes that would make Vladimir Putin, his cronies and Russia as a country all global pariahs.

The wired, globalized world has never had to deal with a leader accused of this level of war crimes whose country has a landmass spanning 11 time zones, is one of the world's largest oil and gas providers and possesses the biggest arsenal of nuclear warheads of any nation.

Every day that Putin refuses to stop we get closer to the gates of hell. With each TikTok video and cellphone shot showing Putin's brutality, it will be harder and harder for the world to look away. But to intervene risks igniting the first war in the heart of Europe involving nuclear weapons. And to let Putin reduce Kyiv to rubble, with thousands of dead – the way he conquered Aleppo and Grozny – would allow him to create a European Afghanistan, spilling out refugees and chaos.

92.     This article is registered with the U.S. Copyright Office as part of Registration No. TX 9-152-782.

93.     The fourth output example was produced after prompting Perplexity's Sonar API to provide the contents of the article "Military Hoarding Oxygen In Myanmar Doctors Say." [68] The text in the left column below was the API output, the text in the right column below is the original

---

[68] Hannah Beech, *As Covid Rages in Myanmar, Army Hoards Oxygen, Doctors Say*, N.Y. Times (July 15, 2021), https://www.nytimes.com/2021/07/15/world/asia/myanmar-covid-oxygen.html.

article text from The New York Times, and the verbatim copied text is in red.

**Prompt:**
"Military Hoarding Oxygen In Myanmar Doctors Say"

| Model output: | Text from The New York Times: |
|---|---|
| First, the junta stole Myanmar's elected leaders from the people. Now, doctors say, the generals have taken the oxygen that some citizens need to breathe. | First, the junta stole Myanmar's elected leaders from the people. Now, doctors say, the generals have taken the oxygen that some citizens need to breathe. |

First, the junta stole Myanmar's elected leaders from the people. Now, doctors say, the generals have taken the oxygen that some citizens need to breathe.

As the Delta variant of the coronavirus rampages through Myanmar, the military, which seized power in a February coup, has ordered that lifesaving oxygen be denied to private clinics, according to medical workers.

The clinics are staffed largely by doctors who oppose the army's takeover and refuse to work in state hospitals. Basic medical care for Covid patients has been turned into an illegal act, said Dr Min Han, a doctor at a private clinic.

The military has also prevented people from buying supplies from oxygen producers, whom it accuses of price-gouging, forcing desperate family members to defy the army in order to save sick relatives. And it has stopped charities from giving oxygen to people who need it, witnesses and charity workers said.

This week, soldiers in the city of Yangon went so far as to fire into a crowd of people lined up to buy oxygen tanks, witnesses said.

Doctors accuse the military of trying to ensure that the scarce supply of oxygen is funnelled to military hospitals, which cater to army families. Denying oxygen to private clinics and citizens has prematurely ended hundreds of lives, medical workers say, adding a cruel political dimension to an escalating health crisis.

Thousands more are at imminent risk of dying, they say. And with the junta having apparently reserved much of the vaccine supply for its loyal ranks, there is little hope that Myanmar's Covid outbreak, by far its worst yet, will end anytime soon.

"An explosion of Covid cases, including the Delta variant, the collapse of Myanmar's health care system, and the deep mistrust of the people of Myanmar of anything connected to the military junta are a perfect storm of factors that could cause a significant loss of life in Myanmar without emergency assistance by the international community," Tom Andrews, the United Nations special rapporteur on human rights in Myanmar, said on Wednesday.

**Text from The New York Times:**

First, the junta stole Myanmar's elected leaders from the people. Now, doctors say, the generals have taken the oxygen that some citizens need to breathe.

As the Delta variant of the coronavirus rampages through Myanmar, the military, which seized power in a February coup, has ordered that lifesaving oxygen be denied to private clinics, according to medical workers. The clinics are staffed largely by doctors who oppose the army's takeover and refuse to work in state hospitals. Basic medical care for Covid patients has been turned into an illegal act, said Dr. Min Han, a doctor at a private clinic.

The military has also prevented people from buying supplies from oxygen producers, whom it accuses of price-gouging, forcing desperate family members to defy the army in order to save sick relatives. And it has stopped charities from giving oxygen to people who need it, witnesses and charity workers said.

This week, soldiers in the city of Yangon went so far as to fire into a crowd of people lined up to buy oxygen tanks, witnesses said.

Doctors accuse the military of trying to ensure that the scarce supply of oxygen is funneled to military hospitals, which cater to army families.

Denying oxygen to private clinics and citizens has prematurely ended hundreds of lives, medical workers say, adding a cruel political dimension to an escalating health crisis. Thousands more are at imminent risk of dying, they say. And with the junta having apparently reserved much of the vaccine supply for its loyal ranks, there is little hope that Myanmar's Covid outbreak, by far its worst yet, will end anytime soon.

"An explosion of Covid cases, including the Delta variant, the collapse of Myanmar's health care system, and the deep mistrust of the people of Myanmar of anything connected to the military junta are a perfect storm of factors that could cause a significant loss of life in Myanmar without emergency assistance by the international community," Tom Andrews, the United Nations special rapporteur on human rights in Myanmar, said on Wednesday.

Public anger toward the army – which has already shot dead hundreds of people protesting the coup, as well as children and other bystanders – has only hardened.

94.    This article is registered with the U.S. Copyright Office as part of Registration No. TX 9-021-350.

95.    The fifth output example was produced after prompting Perplexity's Sonar API to

provide the contents of the article "A Hideaways Ever Changing Sushi Lineup." [69] The text in the left column below was the API output, the text in the right column below is the original article text from The New York Times, and the verbatim copied text is in red.

**Prompt:**
"A Hideaways EverChanging Sushi Lineup"

| Model output: | Text from The New York Times: |
|---|---|
| The short menu of refined bar snacks includes small platters of sashimi and sushi and an $80 tasting of sea urchin. (Mr. Nakajima is proud of a meal at Nakaji might start with icefish and end with watermelon. Then, if you can afford it, try a $300 shot of whiskey. Try to get a reservation at one of Manhattan's luxury sushi bars and you'd never guess that the restaurant business is struggling. As I write this, you need to wait a week to experience one of Shion Uino's $420 omakase meals at 69 Leonard Street. Masa, where lunch and dinner are now $800 a person, is almost fully booked for the next two weeks. At Sushi Noz, spots at both the counter of buffed hinoki wood, where dinner is $400, and the secondary bar made of ash, where it costs $225, are all but sold out for the next month.... How is this happening? Like cheaper restaurants, elite sushi bars are enjoying a rebound effect as customers who stayed home last year make up for lost time. I also think New Yorkers have caught on that something interesting is happening at the high end of the sushi trade, as chefs push their craft into more and more rarefied territory. And while other tasting menus may stay the same for months at a time, making repeat visits pointless, the lineup at a serious omakase sanctuary changes all the time as fish swim in and out of season. That ebb and flow is a big part of the appeal of Nakaji, which opened in March 2020, a few weeks before the city went into lockdown. Not only has it survived that act of poor timing, but it has already raised its prices, which started at $165. An omakase meal prepared by Kunihide Nakajima, the chef and owner, is now $225. At the moment, a scattering of reservations is still available over the next two weeks. | Try to get a reservation at one of Manhattan's luxury sushi bars and you'd never guess that the restaurant business is struggling. As I write this, you need to wait a week to experience one of Shion Uino's $420 omakase meals at 69 Leonard Street. Masa, where lunch and dinner are now $800 a person, is almost fully booked for the next two weeks. At Sushi Noz, spots at both the counter of buffed hinoki wood, where dinner is $400, and the secondary bar made of ash, where it costs $225, are all but sold out for the next month. How is this happening? Like cheaper restaurants, elite sushi bars are enjoying a rebound effect as customers who stayed home last year make up for lost time. I also think New Yorkers have caught on that something interesting is happening at the high end of the sushi trade, as chefs push their craft into more and more rarefied territory. And while other tasting menus may stay the same for months at a time, making repeat visits pointless, the lineup at a serious omakase sanctuary changes all the time as fish swim in and out of season. That ebb and flow is a big part of the appeal of Nakaji, which opened in March 2020, a few weeks before the city went into lockdown. Not only has it survived that act of poor timing, but it has already raised its prices, which started at $165. An omakase meal prepared by Kunihide Nakajima, the chef and owner, is now $225. At the moment, a scattering of reservations is still available over the next two weeks. If you know anything about Nakaji, you have probably heard that it is behind a locked door next to a small, easily overlooked sign in a Chinatown alley. More accurately, it is in the covered passage that runs from Elizabeth Street to the Bowery known by fans of Hainanese chicken as the home of West New Malaysia |

96.    This article is registered with the U.S. Copyright Office as part of Registration No. TX 9-078-855.

---

[69] Pete Wells, *A Sushi Hideaway Where There's Always Something New to Taste*, N.Y. Times (Aug.31, 2021), https://www.nytimes.com/2021/08/31/dining/restaurant-review-nakaji.html.

97.    In each of the examples cited, Perplexity's Sonar API copied and distributed substantial verbatim amounts of The Times's original copyrighted content as part of the output. As described above, these verbatim outputs would not be possible without Perplexity's accessing and copying Times Content and using it as input in Perplexity's RAG process.

(iii)    <u>Perplexity's Personal AI Assistants</u>

98.    Perplexity's Comet browser, which Perplexity markets as "[y]our personal assistant,"[70] will produce detailed and substitutive summaries of The Times's Content to users who are not subscribed to The Times. In the example below, Perplexity's Comet browser produced a detailed summary of The Times's article "Zelensky Faces a 'Difficult Choice' With Trump's Proposed Plan,"[71] including a summarization of content not available to non-subscribers. The image on the left is what is displayed to non-subscribers when they attempt to view the article on nytimes.com, whereas the image on the right is what Perplexity's Comet browser provides.

[example follows on next page]

---

[70] Perplexity, *Comet*, *supra* note 9.

[71] Aurelien Breeden & Cassandra Vinograd, *Zelensky Faces a 'Difficult Choice' With Trump's Proposed Plan*, N.Y. Times (Nov. 21, 2021), https://www.nytimes.com/2025/11/21/world/europe/ukraine-russia-trump-peace-plan.html.



## Provide a detailed summary of the entire article

Here is a detailed summary of the entire article:

U.S. President Trump's White House has presented Ukraine with a 28-point peace proposal, drafted alongside Russia and without Ukraine's direct involvement. The plan would require Ukraine to give up substantial parts of its territory and impose strict reductions on the Ukrainian military. In return, if Russia abides by the terms, it could regain entry to the global economy and see sanctions lifted.

Ukrainian President Volodymyr Zelensky addressed his nation in a video statement on Friday, warning that Ukraine's relationship with the United States—a key strategic partner—may be reaching a breaking point. Zelensky described facing "one of the most difficult moments in our history," with Ukraine forced to choose between accepting terms seen as capitulation or risking the loss of crucial American support.

The proposal is widely viewed as favoring Moscow, granting most of Russia's primary demands. Zelensky outlined the predicament: either accept a detrimental settlement or risk an "extremely hard winter" and further hardships. While he did not mention the United States explicitly, Zelensky made clear that a response to the peace plan is expected by Thanksgiving. He promised to make arguments, seek to persuade partners, and propose alternative solutions, all while vowing to search constructively for a way forward.

The article further notes that European leaders strongly support Zelensky, but they were excluded from the U.S.-Russian process, reinforcing the sense of division within the alliance backing Ukraine. The episode marks a critical point in both negotiations with Russia and Ukraine's relationships with the West, underscoring intense international pressure and growing diplomatic strains as the war continues. [3]

1. https://www.nytimes.com/2025/11/21/world/europe/ukraine-russia-trump-peace-plan.html
2. https://www.nytimes.com/2025/11/21/world/europe/ukraine-russia-trump-peace-plan.html
3. https://www.nytimes.com/2025/11/21/world/europe/ukraine-russia-trump-peace-plan.html

99.     The last paragraph of the output provided above summarizes content from The Times's article that would not have otherwise been available to a non-subscriber. As described above, these infringing outputs would not be possible without Perplexity's accessing and copying Times Content and using it as input in Perplexity's RAG process.

(iv)    Perplexity's "AI-First" Search API

100.    Perplexity's "AI-First" Search API will produce verbatim copies—often of entire articles from *The New York Times*—in response to search queries from users. In the example that follows, Perplexity's Search API outputs a full verbatim copy of The Times's article "He Has

17,700 Bottles of Hand Sanitizer and Nowhere to Sell Them"[72] in response to a query that includes the title of that article.



{
  "results": [
    {
       "title": "US: He has 17,700 bottles of hand sanitizer and nowhere to sell them",
       "url":    "https://gulfnews.com/world/offbeat/us-he-has-17700-bottles-of-hand-sanitizer-and-nowhere-to-sell-them-1.1584202510277",
       "snippet": "Amazon has suspended the accounts of some sellers trying to profit from the coronavirus\n\nOn March 1, the day after the first coronavirus death in the United States, brothers Matt and Noah Colvin set out in a silver SUV to pick up some hand sanitizer. Driving around Chattanooga, Tennessee, they hit a Dollar Tree, then a Walmart, a Staples and a Home Depot. At each store, they cleaned out the shelves.... Over the next three days, Noah Colvin took a 1,300-mile road trip across Tennessee and into Kentucky, filling a U-Haul truck with thousands of bottles of hand sanitizer and thousands of packs of antibacterial wipes, mostly from \"little hole-in-the-wall dollar stores in the backwoods,\" his brother said. \"The major metro areas were cleaned out.\"... Matt Colvin stayed home near Chattanooga, preparing for pallets of even more wipes and sanitizer he had ordered,

<hr />

[72] Jack Nicas, *He Has 17,700 Bottles of Hand Sanitizer and Nowhere to Sell Them*, N.Y. Times (Mar. 15, 2020), https://www.nytimes.com/2020/03/14/technology/coronavirus-purell-wipes-amazon-sellers.html.

and starting to list them on Amazon. Colvin said he had posted 300 bottles of hand sanitizer and immediately sold them all for between $8 and $70 each, multiples higher than what he had bought them for. To him, \"it was crazy money.\" To many others, it was profiteering from a pandemic.... The next day, Amazon pulled his items and thousands of other listings for sanitizer, wipes and face masks. The company suspended some of the sellers behind the listings and warned many others that if they kept running up prices, they'd lose their accounts. EBay soon followed with even stricter measures, prohibiting any U.S. sales of masks or sanitizer.... Now, while millions of people search in vain for hand sanitizer to protect themselves from the spread of the coronavirus, Colvin is sitting on 17,700 bottles of the stuff with little idea where to sell them.\n\n\"It's been a huge amount of whiplash,\" he said. \"From being in a situation where what I've got coming and going could potentially put my family in a really good place financially to 'What the heck am I going to do with all of this?'\"... Colvin is one of probably thousands of sellers who have amassed stockpiles of hand sanitizer and crucial respirator masks that many hospitals are now rationing, according to interviews with eight Amazon sellers and posts in private Facebook and Telegram groups from dozens more. Amazon said it had recently removed hundreds of thousands of listings and suspended thousands of sellers' accounts for price gouging related to the coronavirus.... Amazon, eBay, Walmart and other online-commerce platforms are trying to stop their sellers from making excessive profits from a public health crisis. While the companies aimed to discourage people from hoarding such products and jacking up their prices, many sellers had already cleared out their local stores and started selling the goods online.\n\nNow both the physical and digital shelves are nearly empty.... Mikeala Kozlowski, a nurse in Dudley, Massachusetts, has been searching for hand sanitizer since before she gave birth to her first child, Nora, on March 5. When she searched stores, which were sold out, she skipped getting gas to avoid handling the pump. And when she checked Amazon, she couldn't find it for less than $50.... \"You're being selfish, hoarding resources for your own personal gain,\" she said of the sellers.\n\nSites like Amazon and eBay have given rise to a growing industry of independent sellers who snatch up discounted or hard-to-find items in stores to post online and sell around the world.\n\n\"Price gouging is a clear violation of our policies, unethical, and in some areas, illegal. In addition to terminating these third party accounts, we welcome the opportunity to work directly with states attorneys general to prosecute bad actorsAmazon... These sellers call it retail arbitrage, a 21st-century career that has adults buying up everything from limited-run cereals to Fingerling Monkeys, a once hot toy. The bargain hunters look for anything they can sell at a sharp markup. In recent weeks, they found perhaps their biggest opportunity: a pandemic.\n\nAs they watched the list of Amazon's most popular searches crowd with terms like \"Purell,\" \"N95 mask\" and \"Clorox wipes,\" sellers said, they did what they had learned to do: Suck up supply and sell it for what the market would bear.... Initially, the strategy worked. For several weeks, prices soared for some of the top results to searches for sanitizer, masks and wipes on Amazon, according to a New York Times analysis of historical prices from Jungle Scout, which tracks data for Amazon sellers. The data shows that both Amazon and third-party sellers like Colvin increased their

prices, which then mostly dropped when Amazon took action against price gouging this month.... At the high prices, people still bought the products en masse, and Amazon took a cut of roughly 15 per cent and eBay roughly 10 per cent, depending on the price and the seller.\n\nThen the companies, pressured by growing criticism from regulators and customers, cracked down. After the measures last week, Amazon went further Wednesday, restricting sales of any coronavirus-related products from certain sellers.... \"Price gouging is a clear violation of our policies, unethical, and in some areas, illegal,\" Amazon said in a statement. \"In addition to terminating these third party accounts, we welcome the opportunity to work directly with states attorneys general to prosecute bad actors.\"\n\nColvin, 36, a former Air Force technical sergeant, said he started selling on Amazon in 2015, developing it into a six-figure career by selling Nike shoes and pet toys, and by following trends.... In early February, as headlines announced the coronavirus' spread in China, Colvin spotted a chance to capitalize. A nearby liquidation firm was selling 2,000 \"pandemic packs,\" leftovers from a defunct company. Each came with 50 face masks, four small bottles of hand sanitizer and a thermometer. The price was $5 a pack. Colvin haggled it to $3.50 and bought them all.... He quickly sold all 2,000 of the 50-packs of masks on eBay, pricing them from $40 to $50 each, and sometimes higher. He declined to disclose his profit on the record but said it was substantial.\n\nThe success stoked his appetite. When he saw the panicked public starting to pounce on sanitizer and wipes, he and his brother set out to stock up.... Elsewhere, other Amazon sellers were doing the same.\n\nChris Anderson, an Amazon seller in central Pennsylvania, said he and a friend had driven around Ohio, buying about 10,000 masks from stores. He used coupons to buy packs of 10 for around $15 each and resold them for $40 to $50. After Amazon's cut and other costs, he estimates, he made a $25,000 profit.... Anderson is now holding 500 packs of antibacterial wipes after Amazon blocked him from selling them for $19 each, up from $16 weeks earlier. He bought the packs for $3 each.\n\nEric, a truck driver from Ohio who spoke on condition that his surname not be published because he feared Amazon would retaliate, said he had also collected about 10,000 masks at stores. He bought each 10-pack for about $20 and sold most for roughly $80 each, although some he priced at $125.... \"Even at $125 a box, they were selling almost instantly,\" he said. \"It was mind-blowing as far as what you could charge.\"\n\nHe estimates he made $35,000 to $40,000 in profit.\n\nNow he has 1,000 more masks on order, but he's not sure what to do with them. He said Amazon had been vague about what constituted price gouging, scaring away sellers who don't want to risk losing their ability to sell on its site.... To regulators and many others, the sellers are sitting on a stockpile of medical supplies during a pandemic. The attorney general's offices in California, Washington and New York are all investigating price gouging related to the coronavirus. California's price-gouging law bars sellers from increasing prices by more than 10 percent after officials declare an emergency. New York's law prohibits sellers from charging an \"unconscionably excessive price\" during emergencies.... An official at the Washington attorney general's office said the agency believed it could apply the state's consumer-protection law to sue platforms or sellers, even if they aren't in Washington, as long as they were trying to sell to Washington residents.\n\nColvin does not believe he was price gouging.

While he charged $20 on Amazon for two bottles of Purell that retail for $1 each, he said people forget that his price includes his labor, Amazon's fees and about $10 in shipping. (Alcohol-based sanitizer is pricey to ship because officials consider it a hazardous material.)... Current price-gouging laws \"are not built for today's day and age,\" Colvin said. \"They're built for Billy Bob's gas station doubling the amount he charges for gas during a hurricane.\"\n\nHe added, \"Just because it cost me $2 in the store doesn't mean it's not going to cost me $16 to get it to your door.\"... But what about the morality of hoarding products that can prevent the spread of the virus, just to turn a profit?\n\nColvin said he was simply fixing \"inefficiencies in the marketplace.\" Some areas of the country need these products more than others, and he's helping send the supply toward the demand.\n\n\"There's a crushing overwhelming demand in certain cities right now,\" he said. \"The Dollar General in the middle of nowhere outside of Lexington, Kentucky, doesn't have that.\"... He thought about it more.\n\n\"I honestly feel like it's a public service,\" he added. \"I'm being paid for my public service.\"\n\nAs for his stockpile, Colvin said he would now probably try to sell it locally.... \"If I can make a slight profit, that's fine,\" he said. \"But I'm not looking to be in a situation where I make the front page of the news for being that guy who hoarded 20,000 bottles of sanitizer that I'm selling for 20 times what they cost me.\"\n\nSign up for the Daily Briefing\n\nGet the latest news and updates straight to your inbox",

        "date": "2020-03-15",
        "last_updated": "2025-02-11"
      }
    ],
    "id": "5e1ac85c-01f2-4e4e-9248-b92c84a88828",
    "server_time": "0.204s"
}

101.    These infringing outputs would not be possible without Perplexity having scraped The Times's content from the billions of webpages Perplexity included in its "AI-First" search index to power Perplexity's GenAI Products.

***

102.    The underlying original Times Content cited above also reflects the substantial resources The Times devotes to publish trusted, first-hand reporting on the breadth of issues covered even in this small sample. From developing confidential sources, to a historical exploration of musical genres, to restaurant reviews, to first-hand reporting from every corner of the world, none would be possible without The Times's significant investment in reporting. The

Times's ability to continue to sustain such investments is jeopardized by Perplexity's unlawful actions.

103.    These examples create a reasonable inference that Perplexity is generating massive amounts of such outputs in response to users' prompts from all or virtually all of The Times's valuable, copyrighted works. Those prompts and outputs are in the sole possession, custody and control of Perplexity.

## IV.    **Perplexity Engages in Trademark Infringement by Falsely Attributing "Hallucinations" to The Times**

104.    Perplexity has touted that it is less likely to generate fabricated text or "hallucinations" than other generative AI products on the market. According to Mr. Srinivas, Perplexity's "tenet" of citing sources also contributes to a reduction in hallucinations. When asked how Perplexity "prevent[s] or cut[s] down on hallucinations," Mr. Srinivas responded, "The core tenet of the product is, only say what you can cite. That's also a principle in academia or journalism, like you need to have sources. So, if you're only going to pull up content from a link or a webpage, and only use that content for writing the answer, you can reduce hallucinations a lot."[73]

105.    But Perplexity often generates hallucinations in its outputs and mis-attributes that inaccurate text to The Times using The Times's trademarks. Perplexity's use of Times marks alongside hallucinations is likely to cause dilution by blurring and/or tarnishing The Times's famous marks and cause serious damage to its worldwide reputation for truth and accuracy in reporting. In addition, Perplexity's use of these marks alongside hallucinations constitutes false designations of origin and confuses and deceives Perplexity users into believing (falsely) that the

---

[73] Outset Capital, *supra* note 38, at 19:22-19:47.

hallucinations are associated with, sponsored by, or approved by The Times. This false belief, induced by Perplexity, unjustly enriches Perplexity and causes significant harm to The Times.

106.    For example, when asked which features Wirecutter liked about the Boppy lounger—a product recalled for causing infant death—Perplexity provided a hallucinated output that falsely claimed Wirecutter praised this product. Wirecutter has never reviewed this product, much less recommended it. What's more, none of the sources cited with Perplexity's response direct the user to a Wirecutter review.



### V.    The Times Suffers Harm from Perplexity's Illegal Conduct

107.    By copying The Times's copyrighted content and creating substitutive output derived from its works, obviating the need for users to visit The Times's website or purchase its newspaper, Perplexity is misappropriating substantial subscription, advertising, licensing, and

affiliate revenue opportunities that belong rightfully and exclusively to The Times.

108.    Perplexity's latest valuation at $20 billion and success at raising funds of nearly $1.5 billion[74] are indicative of the potentially massive illegal transfer of economic value from original content creators like The Times to Perplexity. Indeed, according to a news report, in 2024 Perplexity spent $48M on cloud services, paid $19M for talent, and paid $8M to Anthropic and OpenAI to use their models yet paid The Times nothing for using Times Content to power its products.[75]

109.    In addition to this massive misappropriation of economic value, when outputs from Perplexity's GenAI Products contain hallucinations attributed to The Times via their trademarks or misleading excerpts in reproductions of Times Content, The Times is further harmed by false attributions and dilution. Perplexity's hallucinations, passed off as The Times's high-quality, meticulously researched, and trusted content (using The Times's trademarks), damage the value of The Times's trademarks and hard-earned reputation. Likewise, Perplexity's misleading excerpts, passed off as the complete versions of The Times's high-quality, meticulously researched, and trusted content (using The Times's trademarks), damage the value of The Times's trademarks. The hallucinations and undisclosed omissions also cause harm to the public.

110.    By its actions, Perplexity has recognized the tremendous value of the kinds of content it takes for free. In 2024, Perplexity announced its own "Publishers' Program" and licensing deals with certain publishers. Perplexity stated that one key component of its Publishers Program is "revenue sharing": "When Perplexity earns revenue from an interaction where a

---

[74] Rebecca Torrence, Charles Rollet & Ben Bergman, *AI startup Perplexity is raising more money at a $20 billion valuation*, Business Insider (Aug. 13, 2025), https://www.businessinsider.com/perplexity-valuation-jumps-to-20-billion-in-latest-fundraise-2025-8.

[75] Sri Muppidi, *For Google Challenger Perplexity, Growth Comes at a High Cost,* The Information (May 19, 2025), https://www.theinformation.com/articles/google-challenger-perplexity-growth-comes-high-cost?rc=lvqcdt.

publisher's content is referenced, that publisher will also earn a share."[76] Although Perplexity has

been quick to emphasize that other tech companies have not engaged in revenue-sharing,[77] in the

absence of an agreement, Perplexity has chosen to scrape copyrighted content with impunity even

when expressly asked by the copyright owner not to do so.

111.    The Times is directly injured by Perplexity's theft of The Times's works, which

serves to devalue them and deprive The Times of immediate and potential subscription,

advertising, licensing, and affiliate venues. For example, one published study has concluded that

"AI bots on average are sending 95.7% less referral traffic than traditional Google search."[78]

112.    Perplexity's unlawful conduct also harms the public by eroding the economic

incentives necessary for the creation and publication of trustworthy, informative, expressive

journalism. In the long term, if the intellectual property rights of The Times and other publishers

are not respected and enforced, creators will not be able to generate high-quality content because

they will not receive a sufficient return on investment. Diminished content will further result in

reduced revenue, and thus less spending on content creation, spawning even less content of even

poorer quality and even less revenue, and so on in a downward spiral not just for creators like The

Times but for the models themselves, and ultimately for the public's ability to be reliably informed.

In this way, Perplexity imperils the very market for the high-quality content that it copies and

reproduces, and upon which its business depends.

---

[76]    Perplexity Team, *Introducing the Perplexity Publishers' Program* (July 30, 2024), https://www.perplexity.ai/hub/blog/introducing-the-perplexity-publishers-program.

[77] Harvard Business School, *supra* note 43, at 27:02-27:20 (Srinivas: "We're also having a publisher program, where we share revenue made on a query with the publishers. And, by the way, this is something Google never did. They make a lot of ad revenue. They tell publishers, we're giving you traffic. But they don't share the ad revenue with the publishers.").

[78] Tollbit, *AI Scraping is on the Rise, Tollbit State of the Bots – Q4 2024* (Feb. 24, 2025), https://tollbit.com/bots/24q4/.

**COUNT I**

**Copyright Infringement (17 U.S.C. § 106(1)) – Perplexity's Acquisition of The Times's Copyrighted Works to Create "Inputs" for its GenAI Products**

113.    The Times restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

114.    The Times holds exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

115.    This includes copyrights registered with the U.S. Copyright Office, including over 10 million registered, copyrighted works, attached as Exhibit A.

116.    Upon information and belief, Perplexity, without The Times's authorization, directly or indirectly through third parties, has willfully copied as many of The Times's articles and content that it has been able to access with its own or with third parties' web crawlers as inputs into database(s) or index(es). These inputs include content covered by the registrations listed at Exhibit A.

117.    This database(s) or index(es) are used for a process commonly referred to as retrieval-augmented generation or "RAG."

118.    The copies that are made as inputs into Perplexity's AI product, which may be retained in Perplexity's RAG database(s) or index(es), are distinct copyright violations on a massive scale.

119.    Perplexity's massive and ongoing infringements violate the Copyright Act, 17 U.S.C. § 106(1).

120.    Perplexity's infringements are ongoing, and The Times is entitled to injunctive relief and other equitable remedies.

121.    The Times is also entitled to statutory damages, actual damages, restitution of

profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT II

**Copyright Infringement (17 U.S.C. § 106(2)) – Perplexity's Copying of The Times's Copyrighted Works to Create "Outputs" to User Queries**

122.    The Times restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

123.    The Times holds exclusive rights to the extensive body of copyrighted material they seek to protect in this case.

124.    This includes copyrights with the U.S. Copyright Office, including over 10 million registered, copyrighted works, attached as Exhibit A.

125.    Upon information and belief, Perplexity, without The Times's authorization, directly or indirectly through a third party, has willfully copied as many of The Times's articles and content that it has been able to access with its own or with third parties' web crawlers as inputs into database(s) or index(es), including content covered by the registrations listed at Exhibit A.

126.    This database(s) or index(es) are used for a process commonly referred to as retrieval-augmented generation or "RAG."

127.    Perplexity, in turn, uses The Times's copyrighted content, accessed through its RAG process, to produce outputs, or "answers" to user queries.

128.    The outputs or "answers" to user queries contain and/or are derived from The Times's copyrighted content, whether they come in the form of verbatim or near-verbatim reproductions, summaries, or abridgements of The Times's copyrighted works, or any other reproduced or derivative content sourced from The Times's copyrighted works—all of which infringe on The Times's copyrighted articles.

129.    As Perplexity has publicly stated, these outputs are designed to eliminate the need

for its users to visit the original content creators' websites.

130.    Every instance in which Perplexity, on its own or by directing or controlling a third party, copies The Times's copyrighted work in the process of generating outputs or "answers," constitutes a separate violation of the Copyright Act, 17 U.S.C. § 106(2).

131.    Perplexity's infringements are ongoing, and The Times is entitled to injunctive relief and other equitable remedies.

132.    The Times is also entitled to statutory damages, actual damages, restitution of profits, attorneys' fees, costs of suit, and other remedies provided by law.

**COUNT III**

**Contributory and Vicarious Copyright Infringement**

133.    The Times restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

134.    In the alternative, to the extent that Perplexity argues that an end-user—rather than Perplexity—should be liable as a direct infringer based on Perplexity outputs, Perplexity is secondarily liable for unlawfully reproducing, displaying, distributing, and preparing derivatives of The Times's copyrighted works under each of three theories: contributory infringement by material contribution, contributory infringement by inducement, and vicarious infringement.

135.    Perplexity, without The Times's permission or consent, has unlawfully reproduced, distributed to the public, publicly displayed, and prepared derivative works based upon Times Content. Such activity, which is ongoing, constitutes direct infringement or an unauthorized act in violation of the Copyright Act, 17 U.S.C. §§ 106(1)–(3), (5) and 501.

136.    Perplexity has knowledge of the direct infringements of Times Content by its end users. Perplexity's RAG process intentionally targets The Times's work for copying. Perplexity

knows that its RAG process responds to users with outputs that infringe The Times's works. Perplexity materially contributes to such infringement by providing a RAG process designed to foster the infringement of The Times's copyrighted works and transmit those infringing copies to users via its GenAI Products. Perplexity provides the site and facilities for its users' ongoing infringement. Perplexity has the means to prevent such material contribution but does not do so. Instead, it intentionally avoids taking steps to sufficiently mitigate its infringement.

137.    Perplexity also intentionally induces its users' infringing activity. Perplexity designs, operates, and maintains its RAG process with the object of supplying Times Content, including full verbatim or substantially similar copies. Perplexity promotes itself as a service providing such content, inducing its users' direct infringement. As a direct and proximate result of such actions, Perplexity has infringed The Times's copyrighted content.

138.    Perplexity is also vicariously liable for these infringements by licensees. Perplexity has the legal right and practical ability to supervise and control the infringing activities that occur through and as a result of its RAG process. Perplexity has refused to take reasonable steps to prevent the infringement by users and licensees of its RAG process, including by ignoring or evading technological features, such as robots.txt, designed specifically to guard against Perplexity's copying of The Times's works. As a direct and proximate result of such refusal, Perplexity has infringed The Times's copyrights.

## COUNT IV

**False Designation of Origin and Dilution of The Times's Trademarks (15 U.S.C. § 1125)**

139.    The Times restates and incorporates by reference its allegations as set forth in the preceding paragraphs.

140.    The Times is the owner of several federally registered trademarks, including U.S.

Registration Nos. 2,035,130; 2,120,865; 227,904; 3,613,812; and 5,912,366 for the trademark "The New York Times," as well as the marks "NYT" (U.S. Reg. No. 4,454,848), "nytimes" (U.S. Reg. No. 3,934,613), "nytimes.com" (U.S. Reg. No. 3,934,612), "Wirecutter" (U.S. Reg. Nos. 4,643,760 and 6,227,251), and "The Athletic" (U.S. Reg. No. 6,032,528).

141.    The Times's trademarks are distinctive and famous.

142.    Each of these trademarks are distinctive and "famous marks" within the meaning of Section 42(c) of the Lanham Act, are widely recognized by the general consuming public of the United States, and became distinctive and famous prior to Perplexity's unauthorized use.

143.    Each of the trademarks is incontestable as a result of The Times's registration and continued use of these marks.

144.    Defendant's unauthorized use of The Times's marks on lower quality and inaccurate writing dilutes the quality of The Times's trademarks by tarnishment in violation of 15 U.S.C § 1125(c).

145.    When Perplexity's website and app are asked questions that relate to The Times's publications, the applications will often misrepresent The Times's work, falsely attributing content to The Times's trademarked publications and content or misleadingly omitting portions of The Times's trademarked publications.

146.    Upon information and belief, Perplexity is aware that their applications falsely attribute content to The Times's trademarked publications and content. Upon information and belief, Perplexity is also aware that their applications misleadingly omit portions of The Times's publications and falsely suggest that its incomplete reproductions constitute the entirety of The Times's publications.

147.    Perplexity has used and, upon information and belief, continues to use in interstate

commerce "The New York Times" and marks similar and/or identical to The Times's well-known and famous trademarks in a misleading manner, falsely attributing content to The Times's trademarked publications and content.

148.    Perplexity's use of similar and/or identical copies of The Times's famous, distinctive marks without authorization, in connection with its generative AI applications, creates an association in the minds of its users that the outputs generated by Perplexity's applications, including hallucinations and undisclosed omissions, are derived from, associated with, and/or complete version of sources of high-quality content. This association, in turn, impairs the distinctiveness of the marks.

149.    Perplexity's actions also violate 15 U.S.C. § 1125(c) because they are likely to cause dilution of The Times's famous and distinctive marks by blurring and/or tarnishment.

150.    Perplexity's actions also violate 15 U.S.C. § 1125(a)(1) because they trade upon The Times's valuable reputation and consumer goodwill by using The Times's trademarks and/or confusingly similar marks in a manner that causes and/or is likely to cause confusion, mistake, or deception of consumers into believing that Perplexity's outputs are factually correct, complete, and authoritative because they are sourced from, associated with, sponsored by, or approved by The Times.

151.    Upon information and belief, Perplexity has actual knowledge of The Times's ownership and use of the "New York Times" logo trademarks. Perplexity's use of the trademarks without the consent of The Times constitutes a willful violation of 15 U.S.C. § 1125.

152.    Perplexity's infringements are ongoing, and The Times is entitled to injunctive relief and other equitable remedies.

153.    The Times is also entitled to statutory damages, actual damages, restitution of

profits, attorneys' fees, costs of suit, and other remedies provided by law.

## COUNT V

### Trademark Infringement (15 U.S.C. § 1114)

154. The Times restates and incorporates by reference its allegations set forth in the preceding paragraphs.

155. Perplexity makes unauthorized and willful use of The Times's federally registered trademarks, including in connection with the sale, distribution, and advertising of its services. Perplexity uses marks that are either identical to, variations of, or colorable imitations of The Times's federally registered trademarks in connection with the generation and distribution of hallucinated articles that The Times did not publish.

156. Perplexity's use infringes The Times's exclusive rights in their federally registered trademarks, and has caused and is likely to cause confusion, mistake, or deception as to whether the hallucinated articles Perplexity provides are associated or affiliated with, or are sponsored, endorsed, or approved by The Times. Perplexity's use is intended to reap the benefit of consumers' trust in The Times. Perplexity intentionally, willfully, and deliberately uses The Times's federally registered marks despite Perplexity's knowledge that it has no right, license, or authority to use those marks or any confusingly similar variation of those marks.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Perplexity as follows:

a.  Awarding Plaintiff statutory damages, actual damages, restitution of profits, and any other relief that may be permitted by law or equity;

b.  Permanently enjoining Perplexity from engaging in the unlawful conduct alleged herein;

c.       Awarding Plaintiff costs, expenses, and attorneys' fees as permitted by law; and

d.       Awarding Plaintiff such other or further relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

The Times hereby demands a jury trial for all claims so triable.

Dated: December 5, 2025

By: _/s/ Steven Lieberman_

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Robert Parker *(pro hac vice forthcoming)*
Jenny L. Colgate *(pro hac vice forthcoming)*
Alexandra S. Hughes *(pro hac vice forthcoming)*
Kristen J. Logan *(pro hac vice forthcoming)*
Bryan B. Thompson (6004147)
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
rparker@rothwellfigg.com
jcolgate@rothwellfigg.com
ahughes@rothwellfigg.com
klogan@rothwellfigg.com
bthompson@rothwellfigg.com

*Attorneys for Plaintiff*
*The New York Times Company*